Filed 12/29/23  In re C.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re C.R., a Person Coming Under the Juvenile Court Law. | C097796 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STK-JD-DP-2021-0000342) |
| Plaintiff and Respondent, | |
| v. | |
| P.R. et al., | |
| Defendants and Appellants. | |

The juvenile court terminated the parental rights of appellants V.S. (mother) and P.R. (father), freeing the minor for adoption, pursuant to Welfare and Institutions Code section 366.26.[1]  Father now challenges that and previous rulings arguing, inter alia, that he was denied due process during the dependency hearings, and insufficient evidence

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

supported various rulings made by the juvenile court.[2]  Both parents contend the San Joaquin County Human Services Agency (Agency) and the juvenile court failed to comply with the initial inquiry requirements of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.  We shall conditionally affirm, subject to further ICWA compliance.

## LEGAL AND FACTUAL BACKGROUND

On September 7, 2021, the Agency filed a juvenile dependency petition pursuant to section 300, subdivisions (b)(1) and (j), along with a detention/jurisdiction report.

*Section 300 Petition*

The petition alleged that the minor C.R., who was nearly seven months old, was placed into protective custody after mother "failed to participate in voluntary services, which included allowing her support group to check in a few times a week, follow up with mental health services and comply with her prescribed medication regimen." According to the Agency, mother continually struggled with providing proper care and supervision of the minor and the Agency listed several examples in the petition.  The single example of a substantiated allegation of neglect occurred in May 2021, when mother repeatedly administered Tylenol without a medical reason and fed the minor, then three months old, water, orange juice and infant gas drops without a pediatrician's approval or recommendation.  The minor's pediatrician had also voiced concerns over the minor's slow weight gain and feeding schedule.  Several additional allegations of general neglect were inconclusive upon investigation.

The petition also alleged that mother appeared to have untreated mental health issues, which severely impaired her ability to care responsibly for the child.  Specifically,

---

[2]      Mother and father each filed separate briefs.  There is no indication either joined or adopted issues raised in the other's brief.  (See Cal. Rules of Court, rule 8.200(a)(1), (a)(5).)

that mother was diagnosed with schizoaffective disorder, was under the care of a psychiatrist, and was prescribed Lexapro. Mother was not compliant with medication and missed her behavioral health appointments. The Agency also alleged that "mother [was] unable to follow simple conversations if she becomes agitated or stressed." The Agency further alleged that mother spoke in phrases that were nonsensical, such as referring to herself as Judge Judy, referenced "being a tree and someone lighting her up," made comments that she's from Franklin and "she was an exclamation point," and repeatedly chanted the words "chair, listening, brightness."

Under subdivision (j) of the petition, the petition alleged that mother's parental rights as to the minor's half sibling were terminated in March 2011 after mother's problems with drug use and domestic violence put the half sibling at substantial risk of harm.

As to father,[3] the allegations contained in the petition stated, "father to the minor is currently homeless and cannot reside with the mother due to Section 8 rules regarding criminal convictions. . . ."

*Detention and Jurisdiction Hearings*

Both mother and then-alleged father were present at the detention hearing. At the hearing, the juvenile court found a prima facie showing had been made that the minor came within the meaning of section 300 and continued presence in the home of the parent would be contrary to the child's welfare. The minor was ordered detained with temporary placement and care vested with the Agency. The court ordered paternity testing for father, which subsequently concluded father was the minor's biological father.

The jurisdictional hearing began on October 5, 2021. Mother was present with her attorney. Father and his appointed counsel were also present. While we have not been

---

[3] On March 1, 2022, the juvenile court declared father to be the presumed father of the minor. No issue is raised as to paternity.

3

provided with a reporter's transcript for this hearing, the clerk's transcript indicates father waived his right to a trial and submitted on the jurisdictional determination. The clerk's transcript also indicates the court found the allegations of the petition true and that the minor came within the provisions of section 300, subdivision (b)(1). The juvenile court set a new court date, October 19, to serve as the continued jurisdiction hearing for mother, and as a "dispo setting as to father." Father's appearance was excused for that date.

Mother failed to appear at the October 19 hearing, and father's appearance had been previously waived. The juvenile court proceeded with the hearing and again found the allegations in the petition true and that the minor came within the provisions of section 300, subdivision (b)(1). Counsel for the Agency requested two psychological evaluations for mother, stating it sought to bypass her services. The juvenile court granted that request. Father's counsel, who was present without father, requested any referrals for available services. The court asked whether there was an address on file for father; the Agency responded, "He's homeless, so we do not [have one]." The court requested father's counsel relay any contact information to the Agency.

*Disposition Hearing*

In January 2022, two psychological evaluations were ordered for father.

In May 2022, a disposition report was filed. By this time father had been declared the presumed father of the minor. In the disposition report, the social worker noted that in September 2021, visitation was scheduled with the parents to take place in the home of the paternal grandmother, with whom the minor was placed. Referrals were made for parenting classes for the parents, but the parents did not engage in those services. In November 2021, a therapy referral was submitted for father. In February 2022, a bus pass was given to father to engage in services. According to the Agency, father "ha[d] not taken advantage of any of the reunification services that have been provided and truly

4

believes that he only needs to get a permanent job so that he can obtain an apartment for him and his family."

The report also summarized the psychological evaluations for father. In one, Dr. Gary Cavanaugh opined that father had a neurocognitive disorder, dyslexia, a personality disorder, and substance abuse disorders. Dr. Cavanaugh opined that father's mental health disability "does impair his ability to utilize your reunification services and benefit" from them and "I am doubtful that even with reunification services that he would be capable of adequately caring for the child within 12 months unless there was a responsible adult who could assume the primary care for the child." Dr. Cavanaugh recommended a guardian ad litem be appointed for father. Dr. Baljit Atwal also evaluated father and opined that he had a moderate intellectual disability. Dr. Atwal also opined that "it is unlikely that [father] will benefit from reunifications services" due to his cognitive limitations and his lack of stable housing. Dr. Atwal also agreed that "it is unlikely that reunification services within the next 12 months will make [father] capable of caring for his child in a competent manner." The Agency's position was that under section 361.5, subdivision (b)(2), reunification services need not be provided to father because there was clear and convincing evidence, provided by two professionals, that father was suffering from a mental disability rendering him incapable of utilizing those services.

On May 31, 2022, the court appointed a guardian ad litem for father, at father's counsel's request.

The disposition hearing was scheduled to begin on August 4, 2022. Father appeared with his attorney and guardian ad litem. The Agency indicated it was not prepared to go forward with the contested hearing as the social worker was out ill. When the court asked, "What's the position of the parties," father's counsel stated, "He understands the position of the Agency. He would, of course, want services, but he understands the situation and would submit and oppose. He would ask that his visitation

5

remain intact, though." After a discussion about mother's whereabouts, the juvenile court continued the hearing for mother. At father's request, the juvenile court waived his appearance at the continued hearing stating, "I think we resolved — he's already offered a submission and I've accepted it, so just have mother. But he need not be present if we've addressed his other issues." There was no objection to continued visits between father and the minor.

The disposition hearing was continued to August 11. It appears neither father nor his guardian ad litem appeared; father's attorney is not mentioned in the minute order and no transcript of that hearing has been provided. At the hearing, mother opposed and submitted on the report. The juvenile court declared the minor a dependent and removed custody of the minor from the parents.[4] The court found reasonable efforts had been made to eliminate the need for removal of the minor from the home but that, by clear and convincing evidence, there was a substantial danger to the minor if returned home and there were no reasonable means by which the minor could be protected without removal. Finally, the court found by clear and convincing evidence that father suffered from a mental disability that rendered him unable to adequately care for his child and that due to his disability, he was incapable of utilizing reunification services. Thus, the court did not order reunification services for father. The court set a hearing pursuant to section 366.26 for December 7, 2022, and directed the clerk to mail father the writ process information by mail to the last known address.

*Section 366.26 Hearing*

On November 14, 2022, the Agency filed a section 366.26 report. Both parents appeared at the December 7, 2022, hearing. At that time, the court set a contested 366.26

---

**4** The juvenile court adopted the findings and orders in the disposition report filed on May 27, 2022, and adjudged the minor dependent and removed the custody of the minor from the parents.

6

hearing for January 10, 2023, and personally ordered both parents to appear. The parents failed to appear at the contested 366.26 hearing. At the Agency's request, and over the objection of the parents' counsel, the court proceeded with the hearing.

The court found by clear and convincing evidence that it was likely the minor would be adopted, it was in the minor's best interest to have parental rights terminated, and doing so was not detrimental to the minor. The court found none of the exceptions pursuant to section 366.26, subdivision (c)(1) existed and terminated the rights of both parents. The court ordered the minor placed for adoption.[5] The court and parties had no objection to the parents visiting the minor, however, who was placed with paternal grandparents.

## DISCUSSION

### I

### *Writ Advisements*

"An order denying reunification services and setting the section 366.26 hearing is not an appealable order; it can be reviewed only by a writ petition. (*In re Athena P.* (2002) 103 Cal.App.4th 617, 624-625.) The failure to take a writ from a nonappealable dispositional order forfeits any challenge to that order[.] [However, an] except[ion] [exists] if the juvenile court fails to advise a parent of the writ petition requirement. In that case, the parent generally has good cause to be relieved of the requirement. (*Id.* at p. 625.)" (*In re J.R.* (2019) 42 Cal.App.5th 513, 525.) That is what father claims here.

Father did not challenge the order setting a hearing pursuant to section 366.26 by filing a petition for extraordinary writ, but he argues there is good cause to consider his claims of error on appeal because the juvenile court provided defective notice of his right to file such a petition. In response, the Agency acknowledges the writ advisement was mailed five days after the hearing and was sent to mother's address, where father was not

---

**5**      The juvenile court adopted the findings and orders in the section 366.26 report.

7

living.  Nevertheless, the Agency argues that father never designated a mailing address, never indicated he did not actually receive the writ packet and, because father had 12 days from the date of mailing of the writ advisement in which to file his intent to file a writ, he has forfeited his claims.  We agree there is good cause to consider father's claims.

*A.  Additional Background*

The minute order from the August 11 disposition hearing states that the court declared the minor a dependent of the court, removed the minor from the parents' custody, and set a hearing under section 366.26.  The order further states "The clerk is ordered to mail the FATHER the writ process information and forms within 24 hours to LKA."

In the disposition report filed on May 27, 2022, father's address was listed as mother's address in Stockton.  Several pages later, however, the report also indicated that "On October 27, 2021, an Absent Parent Locater was completed for [father].  The report indicated that [father's] mailing address was [in Lodi].  There is also the address which belongs to the mother, [in Stockton].  [Father] has confirmed that he will get his mail if sent to [Lodi]."

The writ advisement packet was mailed, five days later, to father at mother's address in Stockton.  The advisement was subsequently returned as "Return to Sender, Unclaimed, Unable to Forward."[6]  It does not appear the writ advisement was ever mailed to father's address in Lodi.

*B.  Analysis*

"Section 366.26, subdivision (*l*), provides that an order setting a section 366.26 hearing 'is not appealable at any time' unless '[a] petition for extraordinary writ review

---

[6]      The record reflects the writ advisement packet was mailed with a certified article number.  The envelope marked "Return to Sender" had the same certified number.

was filed in a timely manner,' the petition raised the substantive issues and they were supported by an adequate record, and the writ petition 'was summarily denied or otherwise not decided on the merits.' (§ 366.26, subd. (*l*)(1); see § 366.26, subd. (*l*)(2).) This writ requirement is implemented by the California Rules of Court. (See § 366.26, subd. (*l*)(3); [Cal. Rules of Court,] rules 8.450, 8.452; see also [Cal. Rules of Court,] rule 8.403(b)(1).)" (*In re A.H.* (2013) 218 Cal.App.4th 337, 347.) "Failure to file a petition for extraordinary writ review within the period specified by rule, to substantively address the specific issues challenged, or to support that challenge by an adequate record shall preclude subsequent review by appeal of the findings and orders made pursuant to this section." (§ 366.26, subd. (*l*)(2).)

Notice of the parent's right to writ review of the setting order "must be given orally to those present when the court orders the hearing under section 366.26." (Cal. Rules of Court, rule 5.590(b)(1).)[7] If the parent is not present when the court orders a hearing, "within 24 hours of the hearing, the advisement must be made by the clerk of the court by first-class mail to the last known address of the party." (Rule 5.590(b)(2).) The notice "must include the time for filing a notice of intent to file a writ petition," and copies of Judicial Council forms JV-825 and JV-820 "must accompany all mailed notices informing the parties of their rights." (Rule 5.590(b)(3), (4).)

Notwithstanding a parent's failure to file a petition for extraordinary writ, when the court orders a hearing under section 366.26, courts have, as a consequence of the juvenile court's failure to adequately inform the parent of their right to file a writ petition, found good cause to address the merits of a challenge to such orders in an appeal from the order terminating parental rights. (*In re Frank R.* (2011) 192 Cal.App.4th 532, 539; *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1110; *In re Harmony B.* (2005) 125 Cal.App.4th 831, 838-839; *In re Maria S.* (2000) 82 Cal.App.4th 1032, 1038; *In re*

---

[7]     Undesignated rules references are to the California Rules of Court.

*Rashad B.* (1999) 76 Cal.App.4th 442, 450; *In re Cathina W.* (1998) 68 Cal.App.4th 716, 722-726.) It is the parent's burden to show good cause for failure to file a notice of intent and request for record and a writ petition pursuant to section 366.26, subdivision (*l*). (*In re Cathina W.*, at p. 722.)

Here, there is no dispute the juvenile court clerk did not serve father with notice of his writ review rights within 24 hours of the juvenile court setting the section 366.26 hearing, as expressly mandated by rule 5.590(b)(2). "A parent who is absent from the setting hearing has only 12 days after the date the notice is mailed to file her notice of intent to file a writ petition (rule 8.450(e)(4)(B)), so strict compliance with the time for giving notice is crucial to implementing the Legislature's stated intent that reasonable efforts be made to complete appellate review within the applicable time periods for conducting the permanency hearing (§ 366.26, subd. (*l*)(4)(A))." (*In re A.A.* (2016) 243 Cal.App.4th 1220, 1241.) The juvenile court's five-day delay in giving father notice thwarted that legislative intent. (*Ibid.*) Indeed, as the packet was returned unclaimed, it is reasonable to conclude, as we do here, that father never received it. We further conclude the juvenile court clerk erred in mailing the notice to father at mother's address when the Lodi address was provided prior to the disposition hearing and was his confirmed mailing address.

"At the first appearance by a parent or guardian in proceedings under section 300 et seq., the court must order each parent or guardian to provide a mailing address. [¶] (1) The court must advise that the mailing address provided will be used by the court, the clerk, and the social services agency for the purposes of notice of hearings and the mailing of all documents related to the proceedings. [¶] (2) The court must advise that until and unless the parent or guardian, or the attorney of record for the parent or guardian, submits written notification of a change of mailing address, the address provided will be used, and notice requirements will be satisfied by appropriate service at that address." (Rule 5.534(i); see § 316.1, subd. (a).) When the juvenile court complies

10

with section 316.1, subdivision (a), and rule 5.534(i), but the parent fails to inform the court of his or her new mailing address, the parent's failure to receive advisement of writ review rights mailed pursuant to rule 5.590(b)(2) does not constitute good cause to excuse the parent's failure to file a petition for extraordinary writ. (*In re A.H., supra*, 218 Cal.App.4th at pp. 348-351.) Here, the transcript for the detention hearing is not included in the record. The minute order for that date does not specifically reflect that the juvenile court directed father to complete Judicial Council form JV-140 ("Notification of Mailing Address"). Nor is there any indication the juvenile court informed father of the importance of updating his mailing address or that the court inquired into father's address if/when he failed to submit the form.

Normally, where the record is silent as to what was done, it will be presumed that what ought to have been done was not only done but rightly done. (*Steuri v. Junkin* (1938) 27 Cal.App.2d 758, 760.) The failure to provide an adequate record to support the contentions on appeal and support the appellate arguments with appropriate citations to material facts in the record waives the issues on appeal. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.) However, even if we were to presume that the juvenile court complied with section 316.1, we conclude "the notice to [father] was untimely and was not mailed to an address where [he] would likely receive it." (*In re A.A., supra*, 243 Cal.App.4th at p. 1240.)

Whatever the status of father's initial designation of his address, the record shows he notified the social worker that his mailing address was in Lodi. This address first appears in the record in the social worker's disposition report filed on May 27, 2022 — well before the August dispositional hearing. Furthermore, this address was paternal grandmother's address, with whom the minor was placed. (Cf. *In re Rashad B., supra*, 76 Cal.App.4th at pp. 445-450 [finding the maternal grandmother's address, where a minor was placed, was a logical candidate for designation as a mailing address].)

11

We thus conclude the juvenile court did not provide father with timely and adequate notice of his right to seek appellate review of the order setting the hearing, as mandated by rule 5.590(b).  Therefore, notwithstanding father's failure to file a petition for extraordinary writ, we find good cause to consider his claims of error in this appeal.

II

*Appointment of Father's Guardian Ad Litem*

On May 31, 2022, father's counsel requested appointment of a guardian ad litem in light of Dr. Cavanaugh's opinion that such an appointment would be prudent.  The juvenile court effectively granted that request by asking, "Who's up today to pick up an appointment as guardian?  [¶]  Ms. Thomas, thank you."  Father now contends on appeal the juvenile court violated his due process rights by appointing a guardian ad litem without conducting an inquiry into his lack of capacity to understand the nature and consequences of the proceedings or meaningfully assist his counsel and in the absence of substantial evidence of incompetence.  We conclude that the juvenile court violated father's due process rights when it appointed him a guardian ad litem, because he did not consent to the appointment and the court did not inquire into whether or not father was competent.  We also conclude insufficient evidence supports the appointment.  However, we determine these errors did not result in prejudice to father.

Before explaining our reasoning, we must settle some of father's preliminary complaints.  First, he contends that neither he nor his counsel were present during the appointment and that, effectively, the court sua sponte appointed the guardian ad litem.  We disagree.  With respect to father's presence, there is a discrepancy between the transcript, which reported both father's counsel's and father's appearance, and the minute order, which reflects father failed to appear.  " 'The California Supreme Court has . . . stated that "a record that is in conflict will be harmonized if possible." ' " (*People v. Contreras* (2015) 237 Cal.App.4th 868, 880, citing, inter alia, *People v. Harrison* (2005) 35 Cal.4th 208, 226.)  If that is not possible, however, 'we do not automatically defer to

12

the reporter's transcript, but rather adopt the transcript that should be given greater credence under the circumstances of the particular case. [Citations.]' (*Contreras, supra*, at p. 880.)" (*In re D.B.* (2018) 24 Cal.App.5th 252, 257-258.) Here, the circumstances support adopting the reporter's transcript. In addition to counsel's representation, the court appeared to speak to father in stating, "I'm going to ask Father to make and keep an appointment with Ms. Thomas prior to [the next court] date."

Next, father seemingly acknowledges counsel was present for him at the hearing, but it was not his *appointed counsel*, but rather someone father characterizes as merely an *appearance attorney*, who he claims had never represented him before and was not appointed to do so. However, we note the record before us establishes that counsel who appeared for father on May 31 was a member of the same legal team as appointed counsel and appeared more times on behalf of father than anyone else. Indeed, contrary to father's claim, counsel had represented father in at least three court dates prior to requesting appointment of a guardian ad litem.

Finally, father also claims that the appointment violated his constitutional rights to: free speech under the First Amendment; to be free from unreasonable seizures under the Fourth Amendment; and due process under the Fourteenth Amendment. Because only his due process claim is developed beyond a conclusory claim, we limit our discussion to that argument.

*A. Analysis*

When the juvenile dependency court has knowledge of a party's incompetence, it has an obligation to appoint a guardian ad litem. (*In re A.C.* (2008) 166 Cal.App.4th 146, 155.) The test of mental incompetence "is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. [Citations.]" (*In re James F.* (2008) 42 Cal.4th 901, 910.) "The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a

13

contested hearing. [Citations.]" (*Ibid.*) Accordingly, a parent is entitled to due process prior to the appointment of a guardian ad litem. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 669.)

When a "parent's attorney concludes that a guardian ad litem should be appointed, the attorney must either (a) approach the client and request consent to the appointment, or (b) not consult with the client and approach the court directly. If the attorney consults with the client and receives consent for the appointment of a guardian ad litem, the due process rights of the parent will be protected, since the parent participated in the decision to request the appointment." (*In re Sara D., supra*, 87 Cal.App.4th at p. 668.) Father's due process challenges present issues of law that we review de novo. (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1434.)

Here, although father was present when his counsel requested appointment of a guardian ad litem, the record before us does not establish that the court first explained to father what the appointment means in general and what it would mean to father or asked if he consented to such appointment. Nor does the record reflect that counsel consulted with father on such. (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1189.) Instead, the court asked father to make and keep an appointment with the guardian ad litem. On this record, it cannot be said that this exchange satisfied due process requirements. (See *In re Joann E.* (2002) 104 Cal.App.4th 347, 355-356 [the parent must be informed of the significance of the appointment to establish knowing consent to appointment of guardian ad litem].) The juvenile court or counsel should have explained to father the purpose of a guardian ad litem and why his attorney felt one should be appointed, other than the fact that Dr. Cavanaugh believed such an appointment would be prudent. Father should have then been given an opportunity to respond. (*In re Sara D., supra*, 87 Cal.App.4th at p. 672.) This was not done.

To the extent father also contends that the evidence is insufficient to support the appointment of the guardian ad litem, we agree with him. The test of whether a parent is

14

incompetent is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. (*In re James F., supra*, 42 Cal.4th at p. 910; *In re Jessica G., supra*, 93 Cal.App.4th at p. 1186.) Here, father's counsel appeared to rely solely on the opinion of Dr. Cavanaugh in requesting the guardian ad litem appointment. Father's counsel did not make a record of the foundation or factual basis of father's incompetence. While Dr. Cavanaugh and Dr. Atwal both diagnosed father with cognitive impairment, there is simply no evidence in the record that father did not understand the nature of the proceedings or was unable to assist counsel in protecting his interests.

While father contends that the error in appointing the guardian ad litem is structural error that requires reversal, we find the harmless error analysis outlined by the Supreme Court in *In re James F.* governs. "[E]rror in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding[, however,] is trial error that is amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice." (*In re James F., supra*, 42 Cal.4th at p. 915.) "We will assume, without deciding, that the harmless beyond a reasonable doubt standard of review is applicable in this case, because it provides a more cautious approach in that if the error is harmless beyond a reasonable doubt it will also be harmless by clear and convincing evidence." (*In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 94.)[8] A due process violation may be held harmless if the record contains substantial evidence of the parent's incompetence (*In re James F.*, at p. 911) or

---

[8]     As noted by the court in *In re Esmeralda S.*, our Supreme Court declined to determine whether the appropriate harmless error standard of review in juvenile dependency proceedings for constitutional error is harmless beyond a reasonable doubt or harmless by clear and convincing evidence. (*In re Esmeralda S., supra*, 165 Cal.App.4th at p. 94, citing *In re James F., supra*, 42 Cal.4th at p. 911, fn. 1.)

if the outcome of a proceeding has not been affected (*id*. at p. 918; see also *In re Samuel A.* (2021) 69 Cal.App.5th 67, 83, *In re Esmeralda S., supra*, 165 Cal.App.4th at p. 93).

Having determined the record before us does not contain substantial evidence of father's incompetence, we proceed to determine whether the error was harmless by considering whether the appointment of a guardian ad litem for father in this case affected the outcome of the disposition or termination hearings. (*In re Esmeralda S., supra*, 165 Cal.App.4th at p. 93.) In support of his claim that he was prejudiced by the erroneous appointment, father cites to *In re Samuel A., supra*, 69 Cal.App.5th 67. In that case, the mother exhibited unruly and obstructive behavior. The court unsuccessfully attempted to address the mother's behavior, such as calling security, issuing restraining orders, and appointing different counsel. (*Id.* at pp. 83, 74-77.) The court then appointed a guardian ad litem and ordered the mother's communication with counsel to come exclusively through the appointed guardian. (*Id.* at p. 77.) The appellate court in *Samuel A.* found there was not substantial evidence of the mother's incompetence and the appointment resulted in the mother being "prohibited from communicating directly with counsel purportedly representing her" at the permanency planning hearing (*id*. at p. 81, fn. 8), which could have affected her "right to actively participate" in the hearing (*id*. at p. 82). In short, the challenged appointment of a guardian ad litem violated the mother's due process right to directly communicate with counsel. (*Id.* at p. 81.) Here, in contrast to *Samuel A*., father does not argue that any comparable communication impediments resulted from the appointment of his guardian ad litem.

Nor does father provide any reason as to how the appointment of the guardian ad litem may have affected the outcome of the case. "A finding that the juvenile court's error was prejudicial must be based on a claim of prejudice rather than speculation of possible prejudice — because it is simply inefficient to reverse a dependency judgment based upon speculation that an offending parent may have handled the case differently than his or her guardian ad litem." (*In re Esmeralda S., supra*, 165 Cal.App.4th at p. 96.)

On the record before us, nothing suggests father was prejudiced by the appointment because the record demonstrates the guardian ad litem played no role in the outcome of the case at all. Indeed, the guardian ad litem was silent throughout the proceedings. Father does not argue that the guardian ad litem interfered with his ability to express his wishes to the court or to argue any relevant legal or factual position — which counsel did on father's behalf by seeking continuances and services for father. Nor does father argue that the appointment of the guardian ad litem precluded him from offering any evidence he wished. Thus, it appears from the record that father remained unencumbered by the guardian ad litem to fully participate in the proceedings and that the hearings would have proceeded in the same manner absent the appointment. As will be discussed *post*, there is substantial evidence in the record to support the juvenile court's finding that mother was not capable of caring for the minor due to a history of neglect and untreated mental health issues. And there is substantial evidence to support the finding as to father's homelessness and inability to competently care for the minor due to his cognitive disabilities. This evidence supported the juvenile court's dispositional and termination hearings. Under these circumstances, the outcome of the disposition or termination hearings would have been the same regardless of the appointment. (See *In re Esmeralda S.*, at pp. 95-96 [due process violation in appointment of guardian ad litem was found harmless where nothing in the record suggested that the parent was unable to express her thoughts to the court and the record did not support the conclusion that the outcome of a proceeding was affected by the violation].)

We thus conclude the appointment of the guardian ad litem did not affect the outcome in this case and any error in appointing the guardian ad litem was harmless beyond a reasonable doubt.

17

# III

## *Jurisdiction*

Father contends the juvenile court erred in its jurisdictional finding as to father. He argues the only allegation pertaining to him was that he was homeless and, under recently enacted legislation, a jurisdictional finding may not be based solely on father's homelessness.  Father is mistaken.

Dependency jurisdiction may be assumed over a child under section 300 if, as alleged here, there is a substantial risk that the child will suffer serious physical harm or illness as a result of the parent's failure or inability to adequately supervise or protect the child (§ 300, subd. (b)(1)(A)), the parent's willful or negligent failure to provide the child with adequate food, clothing, shelter, or medical treatment (§ 300, subd. (b)(1)(C)), or the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse (§ 300, subd. (b)(1)(D)).  "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)  "The focus of section 300 is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

It is important to note that "[J]urisdiction is taken *over the child*, not over or 'as to' the parent(s).  (See §§ 300, 355, subd. (a) [at jurisdiction hearing, court considers whether minor is a person described by § 300 and considers evidence 'relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court'].)" (*In re A.J.* (2022) 77 Cal.App.5th 7, 14.)  "The court gains personal jurisdiction over a parent when the parent is properly noticed.  (*In re Daniel S.* (2004) 115 Cal.App.4th 903, 916.)  Likewise, disposition is made *of the child*.  (See §§ 355, subd. (a), 358 [proper disposition is made 'of the child']; see also § 355.1.)" (*Ibid.*)

"For this reason, *there is only one simultaneous adjudication of jurisdiction, and one simultaneous disposition*.  These orders are child-centric, not parent-centric, and

cannot be 'split' as to each parent." (*In re A.J., supra*, 77 Cal.App.5th at p. 14.) Father asks us to "reverse the jurisdictional findings as to father and all disposition orders that followed for him." As indicated above, the juvenile court's jurisdictional and dispositional orders were not *as to father*, and we decline to reverse them.

To the extent father argues that in light of a recent legislative amendment to section 300, subdivision (b), the juvenile court erred in sustaining the (b-6) allegation, namely that father was homeless and unable to reside with mother due to Section 8 housing rules, and had previously been convicted of misdemeanor battery, we disagree.

Effective January 1, 2023, subdivision (b)(2)(C) of section 300 provides: "A child shall not be found to be a person described by this subdivision solely due to . . . [¶] . . . [i]ndigence or other conditions of financial difficulty, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare." (See Stats. 2022, ch. 832, § 1.)

"The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.) We review the jurisdictional findings for substantial evidence, and it is the parent's burden on appeal to show there is insufficient evidence to support the juvenile court's order. (*Id.* at pp. 411-412.) However, to the extent statutory interpretation is involved, our review is de novo. (*Id.* at p. 412.)

Contrary to father's claim, the newly added provision under subdivision (b)(2)(C) is not applicable here. The plain language of the amendment regarding indigency and homelessness states that the provision took effect on January 1, 2023. The jurisdictional finding in this case took place in 2021 — well before the provision was added or became effective. There is no indication in the statute that this amendment was meant to have retroactive effect, and father does not argue otherwise. (*In re Cindy B.* (1987) 192 Cal.App.3d 771, 779-780 ["The Legislature may make a law retroactive in its effect,

19

but only when the intention to do so clearly appears"].)  Even if the added provision was retroactive, father's homelessness was one of many factors placing the minor at risk of harm pursuant to section 300, subdivision (b) such that subdivision (b)(2)(C) would still not apply.  (See *In re M.D.* (2023) 93 Cal.App.5th 836, 856 [concluding § 300, subd. (b)(2)(C) inapplicable where indigence was not the sole factor placing a minor at risk of harm pursuant to § 300, subd. (b)(1)].)

Finally, contrary to father's position, "a jurisdictional finding good against one parent is good against both.  More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent.  [Citations.]  This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.)  Here, the allegations found true by the juvenile court included that mother was not capable caring for the minor due to a history of neglect and untreated mental health issues.  Father does not address the sufficiency of the allegations pertaining to mother and substantial evidence supports the juvenile court's jurisdictional finding.

IV

*Disposition and Bypassing Services*

Father asserts that the juvenile court erred in removing the minor from father's care and bypassing services to father.  He contends that the evidence was insufficient to deny placing the minor with father, the noncustodial parent, and alternatively that the juvenile court should have placed the minor with paternal grandparents under a guardianship rather than terminating father's parental rights.  We disagree.

*A.  Removal of The Minor*

Pursuant to section 361, subdivision (c)(1), the juvenile court may *remove a child from the physical custody of a parent* if it finds, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there

are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)  "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a).)

Additionally, "pursuant to sections 361, subdivision (a), and 362, subdivision (a), orders limiting the control of the parents of a dependent child and providing for the care, custody, supervision, conduct and support of that child, including *removing the child from the custody of a noncustodial parent* and determining where that child shall live while under the jurisdiction of the court, are proper so long as the evidentiary record supports the court's findings that the orders are reasonable and necessary for the protection of the child.  (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1090.)"  (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 350, italics added.)

"A juvenile court's removal order at a disposition hearing will be affirmed on appeal if it is supported by substantial evidence."  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)  "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

21

Contrary to father's claim, the juvenile court made the requisite findings for removal from mother's physical custody under section 361, subdivision (c)(1). The findings and orders adopted by the juvenile court found by clear and convincing evidence that there was a substantial danger to the minor if returned to mother's home and there are no reasonable means by which the minor can be protected without removal. Father does not challenge the sufficiency of the evidence supporting the court's findings as to the allegations pertaining to mother.

Also contrary to father's claims, the juvenile court distinguished between circumstances faced by mother and father and considered alternatives to removal of the minor. Although, as the Agency notes, father never requested the minor be placed with him, the juvenile court considered the appropriateness of placing the minor with him. Rejecting that possibility, the court found by clear and convincing evidence that placement with father "would create a substantial danger" to the minor with no reasonable means to protect the minor without removal.

It appears from the language used, the juvenile court relied upon section 361, subdivision (c) in removing the custody of the minor from both parents, instead of the language in section 361.2, subdivision (a). However, we find the juvenile court's reliance on section 361 rather than section 361.2 harmless error because the court's finding, if appropriate, also satisfies a finding that placement with father would be "detrimental to the safety, protection, or physical or emotional well-being of the child" under section 361.2, subdivision (a).

We also find *In re Anthony Q., supra*, 5 Cal.App.5th at pages 339, 352-353 instructive. In *Anthony Q.*, the appellate court found the juvenile court relied on the wrong statute in ordering a child removed from a noncustodial parent. (*Id.* at p. 339.) Nevertheless, the error was deemed harmless considering the juvenile court's broad discretion as to dispositional (custody) orders and, under section 361, subdivision (a)(1), to "limit the control to be exercised over the dependent child by any parent." (*Anthony*

*Q.*, at p. 346.) Further, section 362, subdivision (a), vests the juvenile court with authority to make "any and all reasonable orders for the care, supervision, custody [and] conduct . . . of the child." (*Anthony Q.*, at p. 346.; see also § 245.5 [juvenile court may make all orders "to the parent . . . [it] deems necessary and proper for the best interests of . . . the minor"].) In short, the juvenile court has broad authority to make a dispositional order it deems reasonably necessary to protect the child's well-being, including an order limiting a parent's control of the child, and determining the child's placement. (*Anthony Q.*, at pp. 353-354.)

Applying these principles here, the juvenile court had broad authority to enter the dispositional orders it deemed reasonably necessary to protect the minor. (§§ 361, 361.2, 362; *In re Anthony Q., supra*, 5 Cal.App.5th at p. 353.) Under the standard set forth in *Conservatorship of O.B., supra*, 9 Cal.5th 989, substantial evidence exists as to father's homelessness and inability to competently care for the minor due to his cognitive disabilities such that the court did not err in concluding that limitations on father's control over the minor were necessary to protect the minor's well-being and that placement with father would be detrimental to the minor's well-being. (See *Anthony Q.*, at pp. 353-354.)

Father also contends alternative arrangements could have been made to avoid removal of the minor from his custody. He claims, without citing evidentiary support from the record, that he could have arranged for the minor's placement with paternal grandmother on his own without a removal order from the court. He notes that paternal grandparents already had five other grandchildren under legal guardianship, and he could have arranged for the minor to join them. He faults the court for failing to advise him regarding the guardianship option under section 360.

Under section 360, a guardianship may occur when a parent informs the juvenile court they are not interested in services after a child has been declared a dependent. (§ 360, subd. (a).) When the parent "has advised the court that the parent is not interested in family maintenance or family reunification services and has executed a written waiver

23

of any of those services, the court may, in addition to or in lieu of adjudicating the child a dependent child of the court, order a legal guardianship . . . ." (§ 360, subd. (a)(1).) Here, there is no indication father advised the court of his desire to have a guardian appointed or that he executed a written waiver of services. It has long been the general rule that, on appeal, "a party . . . cannot successfully complain because the trial court failed to do something which it was not asked to do and which was not before the court." (*State Comp. Ins. Fund v. Maloney* (1953) 121 Cal.App.2d 33, 42; see also *In re L.A.* (2009) 180 Cal.App.4th 413, 427 ["we find that the Legislature intended to authorize the juvenile court to order a legal guardianship [under section 360] at the disposition hearing when the custodial parent agrees to waive reunification services and that parent, the child (when appropriate), and the court agree that it is in the best interests of the child"].) Accordingly, the argument that the court should have considered a guardianship is forfeited.

### B. Bypass of Services

Father claims the juvenile court erred in bypassing services to him. Citing to *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424, he contends that "[m]ild mental retardation is not a sufficient ground, in itself" for removal before the parent has an opportunity to participate meaningfully in reunification services. The Agency argues that the evidence of father's long-time transient status, together with evidence that father would not benefit from reunification services and would not be able to learn to care for the minor on his own, justified bypassing services. We find substantial evidence to support the juvenile court's finding based on clear and convincing evidence.

Absent specific statutory exceptions, parents are usually afforded services to effectuate reunification of families subject to dependency proceedings. (*In re Anthony Q., supra*, 5 Cal.App.5th at pp. 345-346; *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302.) Section 361.5, subdivision (b)(2), provides such an exception, allowing the bypass of reunification services if the parent suffers from a

24

mental disability rendering him or her incapable of utilizing those services. Where the bypass provisions are used to deny services, the juvenile court must make its findings by clear and convincing evidence. (§ 361.5, subd. (b); *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238-1239, disapproved on another ground in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8.)

On review, we utilize the standard of review as stated in *O.B.*, mentioned *ante*. We determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true[,] . . . view[ing] the record in the light most favorable to the prevailing party below." (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1011.)

In this case, two psychologists evaluated father and opined he would not benefit from reunification services due to his neurocognitive disorder and mental disability. Procedurally, the two evaluations by qualified mental health professionals satisfied the requirements of section 361.5, subdivision (b)(2), and Family Code section 7827, subdivisions (a) and (c) to show that father was incapable of utilizing reunification services due to a mental disability. (See *Linda B. v. Superior Court* (2001) 92 Cal.App.4th 150, 152-153.) Furthermore, there were no objections to the qualifications of either psychologist or to the introduction of the evaluations during the proceedings and absent such a timely and clear objection any evidentiary defect is waived. (See *In re Joy M.* (2002) 99 Cal.App.4th 11, 19-21.)

This case is unlike *Tracy J.*, cited by father. In that case, the mother was physically disabled, and the father was diagnosed as mildly mentally retarded. (*Tracy J. v. Superior Court, supra*, 202 Cal.App.4th at pp. 1419-1420.) Neither one could parent without the other. According to the evaluating psychologist, the father was capable of utilizing reunification services but his prognosis for reunifying with the child was poor. (*Id.* at p. 1420.) Reunification services were provided; the parents made progress and demonstrated they were able to learn about nutrition, safety, and basic childhood

25

necessities. (*Id*. at p. 1422.) However, the appellate court ultimately found services were unreasonable because they did not account for the mother's physical disabilities and remained limited to no more than four hours a week, without evidence showing the parents' behavior had jeopardized or would jeopardize the child's safety. (*Id*. at p. 1427.)

Here, in contrast, both psychologists opined that father did not have the capacity to benefit from reunification services and father did nothing to provide evidence to the contrary. Despite the fact that referrals were made for parenting classes and therapy for each parent, neither parent engaged in those services. According to the Agency, father "has not taken advantage of any of the reunification services that have been provided and truly believes that he only needs to get a permanent job so that he can obtain an apartment for him and his family." Thus, on the record before us, there is substantial evidence supporting the court's decision to bypass services to father.

V

*Visitation*

Father argues the juvenile court erred in failing to order visitation at the disposition hearing and otherwise delegated its authority to set a minimum number and duration of visits between parents and the minor. He argues that as a result, he was deprived of meaningful visitation crucial to building a beneficial parental bond which, in turn, compromised his due process rights to establish and litigate the beneficial parental relationship exception to the termination of parental rights. We disagree.

When the juvenile court orders children removed from parental custody, the court generally must provide for visitation as an element of the family reunification process. (See *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138 [citing statutory authority].) Where the court orders visitation to take place, the details of frequency and duration may be delegated to the guardian to determine, as they "are simply aspects of the time, place and manner of visitation." (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376; see *id*. at pp. 1376-1377.)

26

In this case, the juvenile court ordered visitation at the detention hearing and gave the Agency discretion as to how to arrange supervised visits. Within two weeks, supervised visitations began. Over time, the visits increased from one hour to two hours, twice a week. In the disposition report, the social worker reported that supervised visits were occurring two times a week in the paternal grandmother's home. The social worker noted, "The current visitation with the father is reasonable and appropriate and should continue." At the disposition hearing on August 4, father stated he wanted reunification services and for "his visitation [to] remain intact." The court stated there were no objections to father's continued visitation with the minor. Indeed, nobody ever objected to visitation between father and the minor, and father never sought more visits.

Father claims the juvenile court failed to make a visitation order at the conclusion of the disposition hearing. We disagree. Again, while we have not been provided with the transcript of the August 11 disposition hearing, the minute order from the disposition hearing reflects that the court "adopt[ed]" the disposition report, and the case plan included within the disposition report includes a visitation schedule for both parents of twice weekly supervised visits. If father wanted something different, he should have said so. As he did not object below, or seek more visitation, we conclude he forfeited his challenges to visitation. A party generally forfeits the right to claim error as grounds for reversal on appeal when he or she fails to object in the trial court. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.) Principles of forfeiture apply in dependency litigation and preclude a party from "standing by silently" until the conclusion of the proceedings. (*Id.* at p. 222.)

Moreover, " 'due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend.' (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.)" (*In re Mia M.* (2022) 75 Cal.App.5th 792, 807.) Here, father had visitation and notice of the section 366.26 hearing. He was afforded an opportunity to build his relationship with the minor and to

present evidence of the beneficial parental relationship exception.  Father chose not to attend the hearing or to provide any such evidence.  There was no due process violation.

VI

*ICWA*

Father and mother contend that the Agency and the juvenile court failed to comply with the duty of inquiry under the ICWA as to Indian heritage by failing to inquire of maternal and paternal grandparents as to their ancestry.  Parents argue that because the notices were sent to the Bureau of Indian Affairs (BIA) and the tribes prior to conducting a complete inquiry, they were incomplete and therefore defective.  The Agency argues there was insufficient evidence of a reason to believe father was of Indian heritage.  The Agency also argues that they made efforts to inquire of mother's relatives and that any reason to believe mother had Indian ancestry was dispelled by the responses from the tribes.  We agree with the parents that the matter must be remanded because the Agency and the juvenile court failed to comply with their duty of further inquiry under section 224.2, subdivision (e).

A.  *Additional Background*

Father completed a parental notification of Indian status form (ICWA form) indicating he had no Indian ancestry.  Mother's ICWA form indicated that she is or may be a member of the Navajo and/or Cherokee tribe.  In the detention/jurisdiction report, the Agency noted "the mother stated she is Native American and reported that she is Cherokee.  When asked about any relatives being registered she stated none of them were.  She was not able to indicate which side of the family was Cherokee."  In the disposition report, the Agency noted it "has made efforts [to] make ongoing inquiries of the family."

The Agency sent ICWA-030 notices to the BIA.  The notice listed the names, addresses, and dates and places of birth for the child's parents and grandparents.  As to mother, great-grandmother's name, date and place of birth were listed.  Two maternal

28

great-grandfathers were listed: one with a name and date of birth and the other with an address and date and place of birth listed. As to father, one paternal great-grandmother's and one great-grandfather's name and place of birth were listed.

In preparation for the ICWA hearing, the Agency filed a declaration of efforts to identify tribal affiliation. The declaration listed the tribes upon which ICWA notices were served, including the Cherokee Nation, the Eastern Band of Cherokee Indians, the Navajo Nation, the Ramah Navajo Chapter of the Navajo Nation, and the United Keetoowah Band of Cherokee Indians in Oklahoma.[9] The tribes responded that according to their records, the minor is not considered an Indian child. The juvenile court found that the ICWA did not apply in this matter.

*B. Analysis*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The juvenile court and the Agency have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Rule 5.481(a); § 224.2, subd. (a).)

---

[9]  Initially, a response was not received from the United Keetoowah Band of Cherokee Indians in Oklahoma in over 60 days. It appears the tribe did respond and stated the minor was not an Indian child.

29

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

Due to changes in California law over the past few years, agencies now have a broader duty of inquiry and a duty of documentation (§ 224.2, subd. (b); rule 5.481(a)(5)), and courts have been tasked with determining how to assess error when the agency fails to discharge its now-broad duty of inquiry. In addition, section 224.2, subdivision (e), imposes a duty of further inquiry regarding a child's possible Indian status "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child." (See also rule 5.481(a)(4) [further inquiry must be conducted if the social worker "knows or has reason to know or believe that an Indian child is or may be involved"].) Further inquiry "includes, 'but is not limited to,' interviewing, as soon as practicable, extended family members to gather the biographical information required by section 224.3, subdivision (a)(5), to be included in ICWA notices, contacting the Bureau of Indian Affairs and

30

contacting 'the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' " (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 317; § 224.2, subd. (e)(2).) The juvenile court must find the agency engaged in a "proper and adequate further inquiry" and that the agency exercised "due diligence" before finding that the ICWA does not apply. (§ 224.2, subd. (i)(2); *In re K.H.* (2022) 84 Cal.App.5th 566, 601.)

If those inquiries result in reason to know the child is an Indian child, notice to the relevant tribes is required. (25 U.S.C. § 1912(a); § 224.3.) The governing federal regulations require ICWA notices to include, if known, the names, birthdates, birthplaces and tribal enrollment information of all direct lineal ancestors of the child. (25 C.F.R. § 23.111(d)(3) (2022).) State law mandates inclusion of "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C).)

Both parents claim the juvenile court and the Agency failed to conduct a further inquiry into the minor's Indian ancestry and, as a result, the notices sent to the BIA and tribes were incomplete. We review a claim of inadequate inquiry for substantial evidence. (*Adoption of M.R.* (2022) 84 Cal.App.5th 537, 542; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) Although reviewing courts have generally agreed that reversal is dependent on showing prejudice, or a miscarriage of justice, approaches for assessing prejudice have varied. (See, e.g., *In re E.V.* (2022) 80 Cal.App.5th 691, 698; *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578; *In re J.C.* (2022) 77 Cal.App.5th 70, 80; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744; *In re G.A.* (2022) 81 Cal.App.5th 355, review granted Oct. 12, 2022, S276056.) The California Supreme Court has granted

31

review in *In re Dezi C., supra*, 79 Cal.App.5th 769, and we anticipate further clarification on this issue.

Here, the record shows that mother indicated she may have Navajo or Cherokee ancestry. Section 224.2, subdivision (e)(1) specifies that "[t]here is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).) Courts have broadly construed the reason to believe standard. (*In re Benjamin M., supra*, 70 Cal.App.5th at p. 744 [" 'Reason to believe' is broadly defined as 'information *suggesting* that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe' "]; *In re S.R.* (2021) 64 Cal.App.5th 303, 317 [§ 224.2, subd. (e) "forecloses [a] narrow interpretation of what constitutes reason to believe"].) Its broad application is essential to the remedial purpose of the affirmative and ongoing duty to inquire under California law. (*In re T.G.* (2020) 58 Cal.App.5th 275, 295.) Applying those principles here, mother's statement provided a reason to believe the minor in this case is an Indian child.

This reason to believe triggered the further inquiry requirement, but the record fails to demonstrate that such an inquiry was conducted of any family member other than mother. At best, the Agency made attempts to conduct further inquiries of the family. On the record before us, we do not know the nature of those attempts. Nor was there a finding that due diligence was made. Thus, there is insufficient evidence to find the duty of further inquiry was satisfied. California law requires that further inquiry be undertaken by the social worker (§ 224.2, subd. (e)), which includes extended family members, and only after that further inquiry has concluded may the court find that the ICWA does not apply to the proceedings. (§ 224.2, subds. (e)(2)(A), (i)(2) ["If the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an

32

Indian child, the court may make a finding that [the ICWA] does not apply to the proceedings"].) "Additional investigation may not develop further information establishing the need for ICWA notice, but it is essential to the enforcement of the court's and [Agency's] 'affirmative and continuing duty to inquire.' " (*In re T.G., supra*, 58 Cal.App.5th at p. 295.) The juvenile court erred in finding that the ICWA did not apply when neither the court nor the Agency conducted a further inquiry into the minor's Indian ancestry.

In light of the record, and the remedial purpose underlying the ICWA and related California law intended to protect third party rights, we apply the analytical framework set forth by the California Supreme Court in *In re A.R.* for assessing harm, and we conclude the error is prejudicial. (*In re A.R.* (2021) 11 Cal.5th 234, 252-254 [recognizing that while we generally apply a *Watson* likelihood-of-success test to assess prejudice, a merits-based outcome-focused test is not always appropriate because it cannot always adequately measure the relevant harm and where the injury caused by the error is unrelated to an outcome on the merits, tethering the showing of prejudice to such an outcome misplaces the measure, at the expense of the rights the law in question was designed to protect].) Although the parents were asked about Indian ancestry, the juvenile court and Agency nonetheless failed to ensure a reliable finding that the ICWA does not apply by failing to make further inquiries with extended family members to ensure the Agency gathered all available information to provide to the tribes, and remanding for an adequate inquiry in the first instance is the only meaningful way to safeguard the rights at issue. (*In re A.R.*, at pp. 252-254.) The record demonstrates that the maternal grandmother and maternal great aunt were part of mother's support team and were in touch with the Agency on some level. In addition, the Agency had the names and addresses of maternal and paternal grandparents. The Agency was required to inquire of these relatives or provide explanation of their inability to do so. (See *In re Rylei S., supra*, 81 Cal.App.5th at p. 317 [further inquiry includes interviewing, as soon

as practicable, extended family members to gather the biographical information to be included in ICWA notices].)

Because the notices sent to the BIA and the tribes were based on information from an inadequate further inquiry, they were sent without the benefit of any additional information that may have been gleaned from that inquiry. As a result, the notices were incomplete. Accordingly, we remand the case to the juvenile court for further proceedings to address compliance with the inquiry provisions of the ICWA and provide that information to the BIA. (§§ 224.2, subd. (e)(2)(A)-(C), 224.3, subd. (a)(5).)

## DISPOSITION

The orders terminating parental rights are conditionally affirmed, subject only to full compliance with the ICWA as described by this opinion. If, on remand, the juvenile court determines the ICWA applies, the court shall vacate its previous orders terminating parental rights and conduct further proceedings consistent with the ICWA, including a new section 366.26 hearing. (25 U.S.C. § 1914; § 224, subd. (e).) On remand, the parents shall have counsel reappointed and be provided due process, including notice and the right to be heard, for all ICWA compliance proceedings.


                                          /s/
                                    EARL, P. J.


We concur:



     /s/
MAURO, J.



     /s/
BOULWARE EURIE, J.

34