165 Cal.App.4th 84 (2008)
In re ESMERALDA S., a Person Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY DEPARTMENT OF CHILDREN'S SERVICES, Plaintiff and Respondent,
v.
MARLENE G., Defendant and Appellant.
No. E045044.
Court of Appeals of California, Fourth District, Division Two.
July 22, 2008.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*86 Grace Clark, under appointment by the Court of Appeal, for Defendant and Appellant.
Ruth E. Stringer, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.
Neil R. Trop, under appointment by the Court of Appeal, for Minor.

*87 OPINION
McKINSTER J.
Marlene G. (Mother) appeals from the juvenile court's order terminating her parental rights to her child, Esmeralda S. (Welf. & Inst. Code, § 366.26, subd. (c)(1).)[1] Mother makes two contentions. In the published portion of our Discussion, Mother argues that her due process rights were violated when the juvenile court appointed her a guardian ad litem. In the unpublished portion, Mother contends the juvenile court and the San Bernardino County Department of Children's Services (the Department) did not properly inquire into her and Jesus G.'s (Father) possible American Indian ancestry for purposes of complying with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA).[2] We disagree with Mother's contentions and affirm the judgment.

FACTS

1.

DETENTION
On August 3, 2006, San Bernardino city police attempted to stop Mother for a traffic violation. Mother did not stop and instigated a 12-minute police pursuit, during which she committed several traffic violations. Esmeralda, who was seven months old at the time, was in Mother's vehicle during the pursuit. Esmeralda was incorrectly strapped into an inappropriately sized car seat. Mother was arrested and jailed for child endangerment. The police contacted the Department.
Police informed Department employees that they knew Mother, due to prior "domestic issues" at her home. After researching Mother, a Department employee discovered three prior incidents involving Mother. In the first incident, on December 23, 2005, Mother refused to take antibiotics for a fever despite the possibility of transmitting her disease to her infant daughter. Mother was assessed for a possible hold for being a danger to others. (§ 5150.)
The second incident occurred in May 2006, when Mother reported that her six-year-old son was raped. The Department investigated and advised the father of Mother's two oldest children to seek sole custody of the children, which he did.
*88 The third incident occurred in June 2006. Mother informed an employee of the Department that "she was hearing voices telling her that others are trying to break into her home and kill her."
During the investigation of the current case, two Department employees interviewed Mother's sister-in-law, who lives with Mother, and Mother's paternal aunt, who lives next door to Mother. The sister-in-law stated that Mother often locks herself and Esmeralda in her room, and will not allow anyone access to Esmeralda. Mother stores her feces and urine in jars in the kitchen. Mother wrote the name "Andrew" on Esmeralda's belly in felt marker and instructed family members to address Esmeralda as "Andrew."
While at Mother's house, the Department employees observed that there was no baby formula, no baby clothes, and very few diapers. The employees observed a baby bottle that was one-quarter full of moldy fruit cocktail.
Father, who is an alleged father, is incarcerated in a Colorado state prison for transporting a controlled substance across state lines. Father is scheduled to be released in 2014. Esmeralda was placed with Mother's paternal aunt.
On August 9, 2006, Mother's trial attorney requested the court appoint a guardian ad litem for Mother. Without any discussion, the court agreed to make the appointment. The court asked Mother if she had American Indian ancestry. Mother responded that she did, but that she would need to get the details from her grandmother. The court ordered Mother, with assistance from her guardian ad litem, to complete the Judicial Council form JV-130 concerning American Indian ancestry.[3] The court found that placing Esmeralda in Mother's custody would put Esmeralda in substantial danger. The court ordered that Esmeralda be placed in the Department's custody and continue to stay at Mother's paternal aunt's house.

2.

JURISDICTION/DISPOSITION
On August 30, 2006, Mother offered no comment on the issue of jurisdiction and submitted on the issue of disposition. The court found that Father is an alleged father. The court found that Esmeralda came within section 300, subdivisions (b) and (g), and declared her a dependent of the court. The court ordered Esmeralda be placed in the custody of the Department. Additionally, *89 the court ordered Mother to participate in her case plan, which included a psychological evaluation, general counseling, parenting classes, and child development classes.

3.

PSYCHOLOGICAL EVALUATION
On January 8, 2007, a report was issued regarding Mother's psychological evaluation. During the evaluation, Mother reported that her primary sources of income were payments from her children's fathers and money from a man whom she traveled with and had sex with. Mother also reported that she lives in a four-bedroom house with her mother, two sisters, one brother, her brother's wife, and seven children. Mother could not recall how long she had lived at the residence. Mother admitted hearing voices coming from her fish tank and having visual hallucinations. Mother feels sad, thinks of death, has racing thoughts, has difficulty understanding what people say to her, has problems understanding what she reads, and cannot find her way home from familiar places.

4.

CRIMINAL CASE AND PLACEMENT
On January 10, 2007, a criminal court in San Bernardino found Mother competent to stand trial. Mother pled guilty to willfully inflicting harm on a child (Pen. Code, § 273a, subd. (a)), and fleeing from a pursuing peace officer (Veh. Code, § 2800.1). Mother was sentenced to time served and released from jail. Mother went to her paternal aunt's house and asked to see Esmeralda. Esmeralda was not present, because she was at her paternal grandmother's house in Brawley. The Department requested that Esmeralda's placement be immediately changed to her paternal grandmother's house in Brawley. The court ordered Esmeralda's placement be modified accordingly.

5.

SIX-MONTH REVIEW
In the Department's February 28, 2007, status report, it is recommended that Mother be offered six more months of services and that Esmeralda continue to be placed in the Department's custody, because Mother continued to exhibit symptoms of mental illness and was not medicated. When a Department employee interviewed Mother, Mother mentioned that *90 Esmeralda likes to eat peanut butter and chocolate. Mother's relatives told the Department employee that they believed Mother was feeding Esmeralda peanut butter mixed with feces.
At the six-month review hearing on February 28, 2007, the court found it would be detrimental to Esmeralda to return her to Mother's custody.

6.

12-MONTH REVIEW
In the Department's August 28, 2007, status report it is recommended that Esmeralda continue to be placed with her paternal grandmother and that the court order a hearing for considering termination of parental rights. The report reflects that Mother was unemployed, but that her relatives were providing for her needs. Mother attended counseling and regularly visited Esmeralda; however, Mother was unwilling to take prescription psychotropic medication. A Department employee concluded that Mother had not completed her case plan, because she was unemployed, did not have her own residence, and was not adequately addressing her mental health issues. It is also noted in the report that Esmeralda's paternal grandmother hoped to adopt Esmeralda, and that the grandmother wanted to allow Mother to have a continuing role in Esmeralda's life.
Mother's attorney requested a contested 12-month review hearing, because Mother believed that she completed her case plan and was capable of caring for Esmeralda. On September 18, 2007, the court held the contested hearing. Mother testified at the hearing. Mother stated that she was unemployed and living in the living room of her uncle's house. Mother testified that she was supporting herself with $500 she received from the sale of her brother's house. Mother admitted that she refused to take medication because "it has too many side effects." Mother stated that if Esmeralda were returned to her custody then she would move to a friend's house. Mother testified that Esmeralda should not stay with her grandmother because there are no children at the house for Esmeralda to play with.
The court found it would be detrimental to Esmeralda to return her to Mother's custody, and that it was unlikely that Esmeralda would be returned to Mother's care within six months. The court ordered that Mother's reunification services be terminated.

*91 7.

TERMINATION
In the Department's January 15, 2008, report, it is noted that Esmeralda's paternal grandmother hoped to adopt Esmeralda. The grandmother is 48 years old, and lives in a three-bedroom house with her 46-year-old fiancée, and her two children who are ages 20 and 17. Esmeralda's grandmother has been employed by the same company for four years and has a high school diploma. Esmeralda's grandmother is willing to maintain relationships with Esmeralda's mother and half siblings. The Department recommended that Mother's parental rights be terminated so that Esmeralda's grandmother could adopt Esmeralda.
Mother requested a contested hearing concerning issues of adoptability and possible exceptions to the termination of her parental rights. (§ 366.26.) The court held the contested hearing on January 30, 2008. Mother testified at the hearing. Mother stated that it would be better for Esmeralda to be returned to her custody, because she lives near family and children that Esmeralda could play with.
The court found that it was likely Esmeralda would be adopted. The court terminated Mother's and Father's parental rights.

DISCUSSION

1.

GUARDIAN AD LITEM

A. Due Process
Mother contends the juvenile court violated her due process rights by appointing her a guardian ad litem. Mother argues that her rights were violated because (1) she did not consent to the appointment; and (2) the court did not follow the proper procedures for appointing a guardian. The Department concedes that the juvenile court violated Mother's due process rights when appointing a guardian ad litem for Mother; however, the Department argues that the violation was harmless. We agree with both Mother and the Department that the court violated Mother's due process rights. We briefly explain the violation.
*92 (1) "In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. (Code Civ. Proc., § 372; [citation].) The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. [Citations.] The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing. [Citations.] [¶] Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. [Citation.] The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. [Citation.] If the parent consents to the appointment, the parent's due process rights are satisfied. [Citation.] A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent. [Citation.] If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence. [Citation.]" (In re James F. (2008) 42 Cal.4th 901, 910-911 [70 Cal.Rptr.3d 358, 174 P.3d 180] (James F.).)
At the detention hearing, Mother's trial attorney requested the court appoint a guardian ad litem for Mother, based upon his interview of Mother. Without any questions or a hearing, the court agreed to appoint a guardian ad litem for Mother. Nothing in the record reflects that Mother consented to the appointment. Accordingly, we agree with Mother and the Department that the court violated Mother's due process rights when it appointed her a guardian ad litem, because Mother did not consent to the appointment and the court did not inquire into whether or not Mother was competent.

B. Harmless Error
(2) Our Supreme Court recently determined that a due process violation concerning the appointment of a guardian ad litem for a parent in a dependency proceeding is subject to harmless error analysis. (James F, supra, 42 Cal.4th at pp. 915-917.) Despite this recent decision, two questions are left unanswered. The first question concerns the application of the harmless error analysis. The second question concerns the standard of review in the harmless error analysis.

*93 (i) Application of the Harmless Error Analysis

In James F., our Supreme Court determined that a juvenile court's violation of a parent's due process rights in a dependency proceeding may be deemed harmless "[i]f the outcome of a proceeding has not been affected" by the violation. (James F, supra, 42 Cal.4th at p. 918.) It is unclear what is meant by "the outcome of a proceeding." In their briefs, both Mother and the Department argue an error may be deemed harmless if (1) the guardian would have been appointed despite the violation; and (2) the termination of parental rights would have occurred despite the violation. As we will explain, we conclude the juvenile court's error may be deemed harmless if the outcome of the review hearings and the termination hearing were not affected by the violation. By contrast, we conclude it is not necessary to show that the guardian would have been appointed despite the court's violation.
In James F., our Supreme Court concluded the juvenile court's error was harmless because "[t]he evidence in the record all points to the conclusion that [the father] was incompetent and thus in need of a guardian ad litem."[4] (James F., supra, 42 Cal.4th at p. 916.) This analysis could be interpreted in two ways. First, it could be interpreted as deeming the error harmless because a guardian would have been appointed despite the violation. However, a second way of interpreting the analysis is that the court's focus was on the outcomes of the review hearings and the termination hearings, and that by finding the guardian would have been appointed despite the due process violation, the court was finding that the outcomes of the review hearings and the termination hearing were unaffected by the juvenile court's violation.
We find support for this second interpretation in a policy analysis in James F., where the court stresses the importance of not needlessly reversing dependency judgments. (James F, supra, 42 Cal.4th at p. 918.) The court cites the "strong public interest in prompt resolution of these cases so that the children may receive loving and secure home environments as soon as reasonably possible." (Ibid.) To that end, it appears as though a juvenile court's violation of a parent's due process rights should be deemed harmless if the outcome of the review hearings and the termination hearing were not affected, rather than the outcome of the appointment of the guardian.
In sum, it is unclear from the opinion in James F. which test our Supreme Court was directing reviewing courts to apply when discussing harmless *94 error, i.e., that the error is harmless if (1) the guardian would have been appointed despite the violation; or (2) the termination of parental rights would have occurred despite the violation. We conclude that the more efficient and sensible test is whether a review hearing or termination hearing was affected by the violation. The alternative testthat an error is harmless if the guardian would have been appointed despite the errorcould easily lead to needless reversals, because the fact that a guardian might not have been appointed does not mean a different outcome would have occurred in the review and termination hearings. Accordingly, in the instant case, we determine whether the court's violation of Mother's due process rights was harmless because Mother's parental rights would likely have been terminated despite the court's violation of her due process rights.

(ii) Standard of Review

The second issue we must address is what standard of harmless error review is applicable to this analysis.
In James F., our Supreme Court declined the request of the California State Association of Counties, appearing as amicus curiae, to determine whether the appropriate harmless error standard of review in juvenile dependency proceedings for constitutional error is harmless beyond a reasonable doubt or harmless by clear and convincing evidence. (James F., supra, 42 Cal.4th at p. 911, fn. 1.)
We will assume, without deciding, that the harmless beyond a reasonable doubt standard of review is applicable in this case, because it provides a more cautious approach in that if the error is harmless beyond a reasonable doubt it will also be harmless by clear and convincing evidence.

(iii) Facts

We briefly present the facts that are pertinent to our analysis: At the detention hearing on August 9, 2006, the court asked Mother whether she had American Indian ancestry. Mother responded that she did, but that she would need to get the details from her grandmother. The court ordered Mother, with the assistance of her guardian ad litem, to complete a JV-130 form. Two weeks later, on August 23, 2006, Mother marked the box on the JV-130 form next to the sentence, "I have no Indian ancestry as far as I know." By contrast, Mother did not mark the box next to the sentence, "I may have Indian ancestry." At the hearing on August 30, 2006, the court found that ICWA was inapplicable to Esmeralda's case.

*95 (iv) Analysis

Mother contends that if a guardian had not been appointed then her parental rights may not have been terminated because she might have argued that she had American Indian heritage, which may have made ICWA applicable to her case. Mother's appellate counsel argues that "[i]t is impossible to know what discussion the guardian ad litem had with mother that influenced her to change her position on her possible [American] Indian herita[g]e. However, had it not been for the influence of the guardian ad litem, mother may have continued to assert her belief that she, and consequently, Esmeralda, had come from Native American descent. This would have influenced the outcome of the proceedings by giving her tribe an opportunity to intervene, and possibly impacted all of the court's further decisions about the case." We disagree with this argument for two reasons.
First, despite the appointment of a guardian ad litem, Mother could have told the court that she had American Indian ancestry. Nothing in the record suggests that Mother was unable to express her thoughts to the court either directly or through her appointed guardian, as evinced by Mother testifying at both the 12-month review hearing and the termination hearing. Accordingly, because Mother could have easily raised the issue of her heritage we disagree that the outcome of a review hearing or the termination hearing was affected by the appointment of the guardian ad litem.
(3) Second, the question posed in a harmless error analysis is: Has the outcome of a proceeding been affected by the violation? Mother argues only that the outcome may have been affected, because she may have American Indian ancestry, and she may have argued that ICWA is applicable, and if such arguments had been made they may have affected the proceedings. Whether Mother has American Indian heritage is within her knowledge. (See In re Rebecca R. (2006) 143 Cal.App.4th 1426, 1430, 1431 [49 Cal.Rptr.3d 951] [ancestry is within appealing parent's knowledge].) Mother is not asserting that she does have American Indian ancestry and that she would have claimed such heritage at the juvenile court if the guardian had not been appointed. Accordingly, Mother's argument does not convince us that the outcome of a proceeding has been affected by the violation.
Mother urges us to follow the reasoning of In re Jessica G. (2001) 93 Cal.App.4th 1180 [113 Cal.Rptr.2d 714] (Jessica G.), and In re Sara D. (2001) 87 Cal.App.4th 661 [104 Cal.Rptr.2d 909] (Sara D.). In both cases, the reviewing courts concluded that the juvenile courts violated the offending parents' due process rights by appointing guardian ad litems without following the proper procedures. (Jessica G., at p. 1189; Sara D., at p. 672.) The reviewing courts went on to conclude that the juvenile courts' errors could *96 not be deemed harmless because it was impossible to know what the offending parents might have suggested to their attorneys if the guardian ad litems had not been appointed or what impact witnesses offered by the offending parents may have had on the courts' decisions. (Jessica G., at p. 1189; Sara D., at p. 673.)
(4) We disagree with the harmless error reasoning of Jessica G. and Sara D. We agree with the reasoning of In re Enrique G. (2006) 140 Cal.App.4th 676 [44 Cal.Rptr.3d 724] (Enrique G.). In Enrique G., the appellate court found the juvenile court violated the offending parent's due process rights when it appointed the parent a guardian ad litem. (Id. at p. 684.) The reviewing court concluded that the juvenile court's error was harmless because the offending parent did not cite any prejudice resulting from the appointment of the guardian. (Id. at pp. 686-687.) We agree with this reasoningthat a finding that the juvenile court's error was prejudicial must be based on a claim of prejudice rather than speculation of possible prejudicebecause it is simply inefficient to reverse a dependency judgment based upon speculation that an offending parent may have handled the case differently than his or her guardian ad litem. (See James F., supra, 42 Cal.4th at p. 916 [there is a strong public interest in prompt resolution of dependency cases]; see also People v. Gray (2005) 37 Cal.4th 168, 230 [33 Cal.Rptr.3d 451, 118 P.3d 496] [speculation cannot support reversal of a judgment].)
(5) In sum, we find Mother's argument that the proceedings were affected by the violation to be unavailing. Mother does not contend that any issue other than the completion of her JV-130 form was affected by the appointment of a guardian. Our review of the record reveals that Mother's guardian properly advocated for her parental interests and that Mother never "expressed dissatisfaction with the guardian ad litem or asked the juvenile court to vacate [the] appointment." (James F., supra, 42 Cal.4th at p. 917.) Accordingly, we find the court's violation of Mother's due process rights to be harmless beyond a reasonable doubt.

2.

ICWA[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*97 DISPOSITION
The judgment is affirmed.
Ramirez, P. J., and Gaut, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part 2. of the Discussion.
[1] All further references to code sections are to the Welfare and Institutions Code unless otherwise indicated.
[2] Counsel for Esmeralda has submitted a letter brief urging us to affirm the judgment of the juvenile court.
[3] Judicial Council form JV-130, Parental Notification of Indian Status, is now form ICWA-020.
[4] In James F., the record reflected that (1) the father's parents had previously been appointed to act as the father's conservator under Probate Code section 1801; and (2) the father had been "found mentally incompetent to stand trial in criminal proceedings either shortly before or within days after the guardian ad litem appointment," pursuant to Penal Code section 1367. (James F., supra, 42 Cal.4th at p. 916.)
[*] See footnote, ante, page 84.