Filed 7/17/25  In re R.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.B. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. Y.M. et al., Defendants and Appellants. | F089034 (Super. Ct. Nos. 23CEJ300062-1, 23CEJ300062-2) OPINION |

## THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Mary Dolas, Judge.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant Y.M.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant Andrew B.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Franson, J. and DeSantos, J.

Y.M. (mother) is the mother of R.B. and A.M. (collectively, the children), the subjects of this dependency matter. Andrew B. is the father of R.B. Both parents seek reversal of the juvenile court's orders issued at a selection and implementation hearing that resulted in their parental rights being terminated. Mother contends the juvenile court's appointment of a guardian ad litem for her at a combined jurisdiction and disposition hearing was made in error, and therefore all subsequent orders, beginning with the jurisdictional findings and dispositional orders, should be reversed.

Andrew joins mother's argument and contends that, if the judgment terminating mother's parental rights is reversed, the judgment terminating his parental rights must be reversed as well. Respondent Fresno County Department of Social Services (department) concedes the juvenile court did not follow the procedures for appointing a guardian ad litem but argues the error was harmless in this case. Because the error in failing to follow procedures for the appointment of a guardian ad litem was harmless, we affirm.

## FACTS

### *Initial Removal*

On March 13, 2023, the department received a report alleging physical abuse of R.B. by mother. A bystander witnessed mother hit R.B. over the head with a phone after he ran across a street. R.B. was taken to a hospital for treatment of a one-inch laceration on his head. R.B. and his sibling, A.M., were placed into protective custody by law enforcement. A social worker from the department responded to the police station shortly afterwards. The police officer explained that mother was being charged with felony child abuse and carrying pepper spray without a proper label. The officer believed mother was homeless, and her last residence was recently condemned.

The social worker met with mother at the police station. Mother would not specifically answer the social worker's questions, and she had to be redirected several times during the interview. Mother claimed R.B. ran from her while they were at a clinic, and she was unable to control him. The social worker advised mother of the allegations

2.

of physical abuse. Mother responded that she may have hit R.B., but she claimed that she did not remember. Mother recalled chasing after R.B., but she insisted that she did not intend to hit R.B. with her phone. She denied any use of physical discipline on R.B. Mother reported a diagnosis of anxiety, but she denied having any additional diagnoses. She also admitted to smoking marijuana approximately once per week for an eye issue.

On March 15, 2023, the department filed an original petition alleging the children were described by Welfare and Institutions Code section 300, subdivisions (a) and (b)(1).[1] The petition alleged the children were at risk of suffering serious physical harm inflicted nonaccidentally by mother due to the injuries inflicted on R.B. The petition further alleged mother failed to provide adequate care, supervision, and protection for the children. Andrew B. was identified as an alleged father of R.B., but his whereabouts were unknown. The whereabouts of A.M.'s alleged father, Manuel F., were also unknown.

Prior to the detention hearing, the social worker made additional efforts to inquire of mother's mental health while she remained in custody. Mother indicated she was also diagnosed with schizoaffective disorder apart from anxiety disorder, and she previously took Lexapro and Abilify. She was no longer taking the medication because she missed appointments for her psychotropic medication. Mother was at the clinic on the date of the children's removal to receive a higher dosage of Ativan to control her anxiety. She occasionally heard things and saw people who were not actually there. During her incarceration, mother observed animals and people who were not really present.

Mother eventually acknowledged that she lost patience with R.B. and hit him on the date of the incident. She believed her anxiety and anger were the reasons that she responded by hitting R.B. Mother claimed this incident was the first time that she hit

---

[1]     All further statutory references are to the Welfare and Institutions Code.

3.

R.B.  The social worker informed mother that her children would remain in protective custody due to concerns for her mental health and inappropriate discipline.

At the detention hearing held on March 16, 2023, mother was present and appointed counsel.  The juvenile court ordered the children detained from mother, and a combined jurisdiction and disposition hearing was set for April 13, 2023.

*Jurisdiction and Disposition*

The department's report for the combined jurisdiction and disposition hearing, dated April 6, 2023, recommended the allegations in a first amended petition be found true and family reunification services be provided to mother.  The first amended petition included an additional allegation that the children were at substantial risk of suffering serious physical harm as a result of mother's untreated mental health issues of anxiety and schizoaffective disorder.  The children were placed together in the home of a maternal great cousin, R.P., on March 20, 2023.  However, R.B. was moved to a resource family home due to behavioral issues.

The report detailed mother's history of child welfare referrals.  The seven referrals were either deemed inconclusive or unfounded.  In April 2022, mother reportedly tested positive for marijuana at the time of A.M.'s birth.  Mother had been diagnosed with schizophrenia, and she was not taking her medications.  The hospital resumed mother's medications of Abilify and Lexipro.  In December 2022, it was reported that mother was incoherent and making disorganized speech.  The children were left in the care of the maternal grandmother after a section 5150 hold was placed on mother.

On March 27, 2023, the social worker interviewed mother by phone about her current situation.  Mother reported being homeless, and there were no family members willing to take mother and her children into their home.  The maternal grandmother and R.P. were identified as mother's only support system.  Mother denied any alcohol or drug use.  She desired assistance with housing to regain custody of her children.  The social

4.

worker initiated referrals for parenting classes, mental health, substance abuse and domestic violence assessments with recommended treatment, and random drug testing.

At six years of age, R.B. did not have the vocabulary to hold a conversation about the allegations of abuse, and the department submitted a referral for a developmental assessment with the Central Valley Regional Center. The juvenile court ordered supervised visits between mother and R.B. at one time per week and mother and A.M. at two times per week. However, a criminal protective order prevented any contact between mother and R.B.

At the initial jurisdiction and disposition hearing held on April 13, 2023, mother was present and represented by counsel. Mother's counsel informed the juvenile court that she attempted to advise mother of her trial rights, but her counsel insisted that they "weren't getting anywhere." A request was made to have a guardian ad litem appointed due to mother's inability to assist her counsel or provide information about her services. After several discussions with mother, her counsel concluded that mother "does not understand what is going on regardless of how many times I talked to her about it and it's not assisting me in representing her."

The department and child's counsel made no objection to the appointment of a guardian ad litem for mother. The juvenile court appointed William F. to serve as her guardian ad litem based upon the statements and representations of mother's counsel. The hearing was continued to May 18, 2023, for the guardian ad litem to speak with mother about her trial rights.

At the continued jurisdiction and disposition hearing, mother's counsel and guardian ad litem were both present, but mother was not present. The department's counsel submitted on the recommendations in the department's report. Mother's counsel noted continued difficulties communicating with mother about her trial rights. An objection was entered as to jurisdictional issues by mother's counsel, and she requested

for the guardian ad litem to detail his efforts at communicating with mother about her trial rights.  The guardian ad litem expressed the following:

> "Yes, your Honor.  I have had phone conversations with her the last couple weeks and then I lost contact with her.  I got contact with her again today.  But I did go over everything with her, as far as what was going on in the case.  And as far as what counsel is saying as far as her understanding the waiver of rights, it's very sketchy if she can do that at this point.  My opinion, her best interest at this point is just object for the record and not present any evidence.  She understands that that's what's going to occur and that she's going to get services."

The juvenile court proceeded to find the allegations of the first amended petition true and order family reunification services be provided to mother.  Mother's case plan consisted of domestic violence, mental health and substance abuse assessments with recommended treatment, parenting classes, and random drug testing.  Supervised visits were to occur between mother and R.B. at once per week and mother and A.M at twice per week.  A six-month review hearing was set for November 16, 2023.

### Family Reunification Period

The department's report for the six-month review hearing recommended that mother's family reunification services be terminated.  As of the filing of the report, mother had not contacted her parenting program to complete the final evaluation and pick up her certificate of completion.  Mother missed multiple substance abuse, mental health and domestic violence assessments despite the social worker holding a meeting with mother and her guardian ad litem to discuss her court ordered services.  Mother also failed to register for random drug testing.

The social worker mailed a letter and called mother on multiple occasions to discuss her missed appointments.  However, mother's phone was not accepting calls.  Mother was located in the Fresno County jail on September 26, 2023, and she was released on November 7, 2023.  The social worker had been unable to communicate with

mother since her release from incarceration. Mother's attendance at visits with A.M. were inconsistent, and she was not progressing well with her visits.

At the initial six-month review hearing, mother was not present. The department requested a 30-day continuance because the social worker did not submit the report in a timely manner. Mother was reportedly homeless and using a relative's address. The juvenile court determined that mother was provided adequate notice, and it found mother failed to appear without good cause. A continued hearing was set for December 7, 2023.

Mother was present for the continued six-month review hearing on December 7, 2023. Mother's counsel and guardian ad litem were also present. An additional continuance was requested by the department for the filing of a section 388 petition to support termination of mother's family reunification services. The juvenile court continued the matter without any objection from mother's counsel or guardian ad litem. On December 18, 2023, the department filed a section 388 petition requesting mother's family reunification services be terminated due to her failure to make progress in services.

On January 11, 2024, mother was not present for the continued six-month review hearing, but her counsel noted that mother wanted the maternal grandmother to be assessed for placement of her children. The juvenile court granted another continuance due to the first appearance of R.B.'s father, Andrew.

On January 18, 2024, mother and Andrew both failed to appear for the continued six-month review hearing. The department recommended that Andrew be recognized as the presumed father for R.B. Andrew's counsel requested a continuance for the department to complete an assessment of Andrew and R.B.'s paternal grandmother. Mother's counsel expressed mother's objection to the termination of her family reunification services, but she had no further evidence or witnesses to present due to difficulties contacting mother. Mother's counsel explained mother was previously advised that there was no further evidence to present regarding the recommendation to

7.

terminate her services. The juvenile court elevated Andrew to presumed father status, and continued the six-month review hearing to February 15, 2024.

In an addendum report, dated February 13, 2024, the department provided updates on the social worker's assessments of Andrew and the paternal and maternal grandmothers. Mother had not maintained contact with the department, and service providers' attempts to communicate with mother were unsuccessful. Andrew informed the social worker that he did not want custody of R.B. The department continued to recommend mother's family reunification services be terminated and the setting of a section 366.26 hearing.

At the continued six-month review hearing held on February 15, 2024, mother was not present. Andrew, maternal grandmother, and paternal grandmother were present along with mother's counsel and guardian ad litem. The department's counsel submitted on the department's reports and noted the social worker's intent to place R.B. with his paternal grandmother and A.M. with the maternal grandmother. Andrew was in agreement with R.B.'s placement with the paternal grandmother, and his counsel requested family reunification services be provided to Andrew.

Mother's counsel represented that all of her efforts to contact mother were unsuccessful, and the maternal grandmother was unable to provide any information regarding mother's location prior to the hearing. Her counsel explained that she would be entering an objection to the department's recommendation without further evidence or witnesses due to her inability to speak with mother. Mother's counsel also noted that she was impressed with the department's efforts to place the children with relatives. Mother's counsel believed mother would be "happy" with the department's efforts at relative placement. After hearing from all counsel, the juvenile court terminated mother's reunification services and set a section 366.26 hearing for June 13, 2024. Mother was notified by mail of the need to seek an extraordinary writ from the setting orders.

8.

***Section 366.26 Hearing***

At the initial section 366.26 hearing, mother was present and in custody. The department requested a continuance to make a thorough assessment and recommendation for a permanent plan for the children. The juvenile court continued the hearing to July 16, 2024, and mother was ordered to be present for the continued hearing. At the continued hearing, mother was not present, and mother's counsel explained that mother was in a hospital. The court continued the section 366.26 hearing for further assessment of the children's appropriate permanent plan.

The section 366.26 report, dated November 4, 2024, recommended that the juvenile court terminate mother's parental rights and order a permanent plan of adoption for the children. A.M. was placed in a separate resource family home on August 26, 2024, and her care provider was willing to adopt her. The maternal grandmother failed to complete background clearances and obtain resource family approval.

R.B., at seven years of age, was going to be moved to his previous resource family home due to the paternal grandmother's request to terminate the placement. The paternal grandmother was unable to meet R.B.'s needs, and she believed R.B.'s previous care provider was more suited to care for him.

There were no visits between mother and R.B. during the proceedings because the criminal protective order remained in place. Mother missed more than half of her scheduled visits with A.M., and her last supervised visit took place in April 2023. Mother informed the social worker that she was not in agreement with a plan of adoption, but mother was unable to articulate which plan she preferred.

The department considered R.B. not to be generally adoptable based upon his behaviors and need for continued therapeutic behavioral support. However, he was considered to be specifically adoptable with his prior care provider. R.B.'s prospective adoptive parent previously had placement of R.B. from March 2023 to July 2024. R.B. showed affection to the prospective adoptive parent by frequently hugging her and

speaking to her about his feelings. The prospective adoptive parent expressed her desire to adopt R.B. because she loved him and wanted to provide him with a safe, stable, and loving home.

The department's assessment indicated there did not appear to be a significant parent-child relationship between mother and the children. Mother had not provided care for the children since removal in March 2023, and an active protective order had prevented any contact between mother and R.B. throughout the proceedings. The social worker concluded that R.B. and A.M. would not be affected if parental rights were terminated due to the lack of a significant relationship with any of their parents.

On November 5, 2024, mother was present with her counsel and guardian ad litem. Mother's counsel requested a continuance because the department's section 366.26 report was not filed in a timely manner. The juvenile court continued the section 366.26 hearing to November 12, 2024. Mother and Andrew were both ordered to be present.

At the continued section 366.26 hearing held on November 12, 2024, mother was not present. The department's counsel submitted on the recommendations of the section 366.26 report. Counsel for the children expressed her agreement with the department's recommendation. Mother's counsel explained that mother did not show up to her office, but her counsel requested the guardian ad litem describe his conversation with mother. The guardian ad litem acknowledged that he spoke with mother to explain the department's recommendation. The guardian ad litem then stated, "[mother's] only thing was she wanted to try to still visit with the child. She didn't really say either way whether she objected to it, but it sounded like she did."

Mother's counsel requested additional time to speak with the guardian ad litem and wait for mother to be present. Andrew's counsel joined in the request to trail the matter because Andrew was seen waiting in the line outside of the courthouse. The juvenile court trailed the matter, and Andrew was present when the hearing resumed later that same morning.

10.

Mother's counsel explained that mother was advised of her rights and the nature of the hearing. Her counsel's understanding was that mother did not articulate how she would like to proceed. Given the evidence in the record, mother's counsel did not believe mother was able to establish the first element of the beneficial relationship exception to adoption. The lack of evidence supporting a finding of regular visitation was explained to mother, and she did not provide any information to counter the department's evidence on the issue. Mother's counsel entered an objection to the recommendation to terminate parental rights, and it was requested that the juvenile court order a permanent plan of legal guardianship.

Mother's guardian ad litem expressed his agreement with the statement of mother's counsel, and he acknowledged that he spoke to mother's counsel about his discussions with mother. Andrew's counsel noted an agreement with the recommendation of adoption with R.B.'s prospective adoptive parent. Andrew recognized the prospective adoptive parent did an excellent job with R.B., and he was willing to submit on the department's recommendation.

The juvenile court found the children were likely to be adopted, terminated the parental rights of mother and any fathers, and selected a plan of adoption for the children.

## DISCUSSION

Mother contends the juvenile court erred in appointing a guardian ad litem because mother was not provided an opportunity to be heard on her counsel's request to appoint a guardian ad litem. The department contends that any error in appointing a guardian ad litem for mother was harmless. Mother argues the appointment of a guardian ad litem resulted in prejudicial error because there was insufficient evidence to support the appointment.

### I. Applicable Legal Principles

"[T]he primary concern in section 300 cases is whether the parent understands the proceedings and can assist the attorney in protecting the parent's interests in the

11.

companionship, custody, control and maintenance of the child." (*In re Sara D.* (2001) 87 Cal.App.4th 661, 667, fn. omitted (*Sara D.*).) If the juvenile court has reason to believe that the parent is mentally incompetent, the court has the inherent power to appoint a guardian ad litem. (*Ibid.*; *Mabry v. Scott* (1942) 51 Cal.App.2d 245, 256.)

The appointment of a guardian ad litem transfers control over the litigation from the parent to the guardian. (*In re James F.* (2008) 42 Cal.4th 901, 910–911 (*James F.*).) "The guardian ad litem has broad powers: 'the power to control the lawsuit, including controlling procedural steps necessary to the conduct of the litigation … and controlling trial tactics.' [Citation.] Because 'the decisions made can affect the outcome of the dependency proceeding, with a corresponding effect on the parent … the parent has a direct and substantial interest in whether a guardian ad litem is appointed.' " (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1187.)

"Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. [Citation.] The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. [Citation.] If the parent consents to the appointment, the parent's due process rights are satisfied. [Citation.] A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent. [Citation.] If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence." (*James F.*, *supra*, 42 Cal.4th at pp. 910–911.) "[E]rror in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding is trial error that is amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice." (*Id.* at p. 915.)

## II.     Analysis

In the present case, mother did not expressly consent to the appointment of a guardian ad litem.  Thus, the juvenile court was required to make further inquiry on the record regarding mother's competence to satisfy due process.  (*Sara D.*, *supra*, 87 Cal.App.4th at p. 668.)  Once mother's counsel claimed that mother was unable to provide assistance or information necessary to represent her interests, the court appointed a guardian ad litem without any inquiry or response from mother.  The court or counsel should have explained to mother the purpose of a guardian ad litem and why her attorney felt one should be appointed.  Mother should have then been given an opportunity to respond.  (*Id*. at p. 672.)  This was not done.

In any case, mother suffered no prejudice from the appointment of a guardian ad litem.  A violation of due process requires reversal only if we cannot say that the error was harmless beyond a reasonable doubt.  (*In re Jessica G.*, *supra*, 93 Cal.App.4th at p. 1189; *Sara D.*, *supra*, 87 Cal.App.4th at p. 673.)  We do not determine whether the error was harmless by considering whether the juvenile court would have, nonetheless, found appointment of a guardian ad litem necessary had it followed the proper procedure.  Instead, we determine whether the error was harmless by considering whether the appointment of a guardian ad litem for mother in this case affected the outcome of the proceedings.  (*In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 93 (*Esmeralda S.*).)

Mother asserts harmless error cannot be established because "one cannot know what, if anything, might have been different about the course of the dependency proceedings if mother was aware of and understood the nature and role of a guardian ad litem in her case, or if the court had decided not to appoint a guardian ad litem for her."  The court in *In re Joann E.* reached a similar conclusion.  (*In re Joann E.* (2002) 104 Cal.App.4th 347, 360 (*Joann E.*) ["We cannot speculate how the imposition of the guardian ad litem as an intermediary may have impeded the flow of information about beneficial witnesses between [the appellant] and her attorney, although we know for

certain that no witness aside from [the appellant] herself was ever presented on [the appellant's] behalf."].)

In *Joann E.*, the appellant's attorney announced his intention to call an additional witness at the contested jurisdictional hearing prior to the appointment of a guardian ad litem. The attorney did not present that witness when the hearing occurred. The juvenile court concluded, "This court has no way of knowing who that witness was, the substance of the testimony that would have been offered, or if [the appellant] would have insisted that her attorney call the witness if the guardian ad litem had not been appointed for her." (*Joann E.*, *supra*, 104 Cal.App.4th at p. 360.)

Mother also directs us to our decision in *Sara D.*, *supra*, 87 Cal.App.4th at p. 673. In the case of *Sara D.*, the mother's attorney stated that he had three more witnesses to present. A guardian ad litem was then appointed, and approximately a month later, without further testimony, the guardian ad litem agreed to submit to jurisdiction. Under those circumstances, we concluded that we could not "speculate as to the substance or effect the testimony [of the uncalled witnesses] would have had on the court's decision." (*Ibid.*)

The primary distinction between the present case and the cases cited above is that here there is no indication in the record that any hearings would have been conducted differently in the absence of the guardian ad litem. In both *Sara D.* and *Joann E.*, the attorneys represented to the court that an approach would be taken, and once the guardian ad litem was appointed, the planned course of action did not occur. Thus, it was very clear the appointment of the guardian ad litem impacted those cases, changing the course of the jurisdictional hearing. The appellate courts also had little on the record before them to determine how the guardian ad litem appointments would have affected the remainder of the proceedings.

We are unpersuaded by mother's suggestion that we should engage in speculation about how things might have been different without a guardian ad litem. That is because

14.

"a finding that the juvenile court's error [in appointing a guardian ad litem] was prejudicial must be based on a claim of prejudice rather than speculation of possible prejudice—because it is simply inefficient to reverse a dependency judgment based upon speculation that an offending parent may have handled the case differently than his or her guardian ad litem." (*Esmeralda S.*, *supra*, 165 Cal.App.4th at p. 96.)

In addition, *Joann E.* and *Sara D.* can be further distinguished as those cases were in a different procedural stance. In both cases, the juvenile court had appointed the guardian ad litem during the jurisdictional phase, and the appellant directly appealed the guardian ad litem order. (*Joann E.*, *supra*, 104 Cal.App.4th at pp. 352–353; *Sara D.*, *supra*, 87 Cal.App.4th at pp. 664–665.) Therefore, because of the procedural stance of the cases, the appellate courts were considering the prejudicial effect of the error on the jurisdiction and disposition hearings instead of any subsequent orders.

In contrast, when a parent, as mother here, challenges a guardian ad litem order in an appeal from an order terminating parental rights, the appellate court is in a much better position to assess potential prejudice on the proceedings as a whole rather than the specific hearing where the guardian ad litem was appointed. The case of *Esmeralda S.* is more analogous to the present case procedurally than *Joann E.* and *Sara D. Esmeralda S.* was an appeal from an order terminating parental rights where the appellate court considered a due process challenge to an order appointing a guardian ad litem earlier in the proceedings. There, the juvenile court had made no inquiry into whether the appellant parent was incompetent, and the appellate court concluded this, as well as other factors, constituted a due process violation. (*Esmeralda S.*, *supra*, 165 Cal.App.4th at pp. 91–92.)

In reaching its decision, the *Esmeralda S.* court relied on the policy analysis of *James F.* "where the [Supreme C]ourt stresses the importance of not needlessly reversing dependency judgments. (*James F.*, *supra*, 42 Cal.4th at p. 918.)" (*Esmeralda S.*, *supra*, 165 Cal.App.4th at p. 93.) The *Esmeralda S.* court explained, "The [*James F.*] court cites

15.

the 'strong public interest in prompt resolution of these cases so that the children may receive loving and secure home environments as soon as reasonably possible.' " (*Ibid*.) The *Esmeralda S.* court further explained that "[t]he alternative test—that an error is harmless if the guardian would have been appointed despite the error—could easily lead to needless reversals, because the fact that a guardian might not have been appointed does not mean a different outcome would have occurred in the review and termination hearings." (*Id*. at p. 94.)

We agree with the *Esmeralda S.* court and conclude that even if we were to credit mother's claim of error, this would not automatically render the alleged error prejudicial. Rather, in the interest of judicial economy and the children's best interests, we examine whether the alleged error affected the outcome of the subsequent hearings. Thus, contrary to mother's contention, a harmless error finding does not depend on a parent's incompetence being beyond dispute. Showing that a guardian ad litem would have been appointed regardless because of record evidence that the parent was incompetent is one way to establish harmless error, but it is not the only way. (See *James F.*, at p. 916; *Esmeralda S.*, at p. 94 [asking whether competent parent's "parental rights would likely have been terminated" despite due process violation].) In doing so, we conclude the alleged error is harmless.

We acknowledge that *James F.* did not specify whether "the question of prejudice should be analyzed under the standard for state law error stated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (a reasonable probability of a more favorable outcome), the more exacting standard for federal constitutional error of *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt), or some intermediate standard of prejudice." (*In re Samuel A*. (2021) 69 Cal.App.5th 67, 82, fn. 10, citing *James F.*, *supra*, 42 Cal.4th at p. 911, fn. 1 [declining to address precise harmless error standard].) The parties do not dispute, and we assume without deciding, that *Chapman*'s harmless beyond a reasonable doubt standard applies.

Under this standard, we conclude that the department has carried its burden to show that any error in the appointment of a guardian ad litem was harmless beyond a reasonable doubt. In the present case, it is not conceivable the outcome of the proceedings would have been different but for the guardian ad litem appointment. Mother does not articulate how the result was affected other than to assert that the guardian ad litem did not present any evidence or contest any findings or orders in the case.

The appointment of mother's guardian ad litem had no effect on the subsequent hearings where mother failed to appear when findings and orders were made for the jurisdiction, disposition, six-month review, and selection and implementation hearings. Both mother's court appointed counsel and guardian ad litem entered objections after explaining their several attempts to communicate with mother during each stage of the proceedings. Given the substantial evidence supporting jurisdiction and removal, mother's lack of effort to comply with the case plan and regularly visit during the reunification period, and failure to appear at several hearings, mother's counsel was unable to present any relevant evidence that would have allowed for the juvenile court to decide an issue in her favor.

Similarly, the outcome of the section 366.26 hearing would have been the same with or without the appointment of a guardian ad litem. In fact, due to mother's failure to appear at multiple hearings, the guardian ad litem was the one person who was actually able to provide her with a voice and provide her counsel with a position at each stage in the proceedings. The guardian ad litem did not waive any of mother's rights, and there is no evidence that the guardian ad litem took any action that either disregarded mother's interests or was contrary to her wishes. It also cannot be said that mother was prevented from testifying or otherwise assisting her counsel in directing the litigation because she failed to appear at any of the hearings where the juvenile court entered findings and orders.

17.

At the section 366.26 hearing, the only substantive issue that mother could have possibly provided input was whether termination of parental rights would be detrimental to the children. (§ 366.26, subd. (c)(1).) Mother does not claim she had either witnesses who were not presented or facts to support an exception to termination of parental rights. Given that mother failed to maintain regular visitation with the children throughout almost two years of dependency proceedings, there was no likelihood that mother would have been able to show that the continuation of the parent-child relationship promoted the well-being of the children to such a degree as to outweigh the well-being they would gain in a permanent home with stable, loving, and committed caregivers. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

In sum, it appears from the record that mother's participation in the proceedings was not hindered by the guardian ad litem and that the hearings would have proceeded in the same manner absent the appointment. We therefore cannot say that the appointment of the guardian ad litem "apparently affected the manner in which the [subsequent hearings were] conducted." (*Sara D.*, *supra*, 87 Cal.App.4th at p. 673.) On the record before us, we are confident that the appointment of the guardian ad litem was harmless beyond a reasonable doubt.

## DISPOSITION

The juvenile court's orders are affirmed.