Filed 8/22/25  In re A.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.C., <br><br> Defendant and Appellant. | C101248, C102236 <br><br> (Super. Ct. No. 23JV3266901) |

In the underlying dependency proceedings, the juvenile court initially found that the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state law (Welf. & Inst. Code, § 224.2, subd. (a))[1] did not apply to minor A.R. and that respondent Shasta County Health and Human Services Agency (Agency) had made adequate efforts

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

to obtain information regarding A.R.'s potential Native American ancestry and to contact the appropriate tribes.  Mother appealed the juvenile court's ICWA findings in case No. C101248, arguing (1) the juvenile court improperly shifted the burden to her and maternal grandmother to gather familial information under the ICWA; (2) the Agency failed to conduct an adequate inquiry regarding claimed maternal and paternal Indian heritage; and (3) the Agency's notice to the identified tribes was defective because it omitted pertinent information regarding various Indian ancestors.[2]

Meanwhile, at the request of mother's trial counsel, the juvenile court (without objection) appointed mother a guardian ad litem before the contested section 366.26 hearing.  After considering the evidence presented at the section 366.26 hearing, including mother's testimony, the court terminated parental rights, selected adoption as the permanent plan, and reaffirmed its previous finding that the ICWA did not apply to A.R.  Mother filed a second appeal from the parental termination order in case No. C102236, arguing the court violated her due process rights by appointing the guardian ad litem and that the ICWA inquiry and findings remained deficient.

We consolidated the two appeals for purposes of oral argument and decision only.  The cases were fully briefed on July 18, 2025.

We conclude any procedural errors in appointing the guardian ad litem were harmless beyond a reasonable doubt, and the juvenile court did not improperly shift the ICWA inquiry burden to mother or grandmother.  However, we agree that the Agency's

---

[2]  Mother's purported request for judicial notice of a document from the BIA defining the meaning of "active efforts" under ICWA, made in her opening briefs in both appeals, is improper.  A request for judicial notice must be made in a separate motion.  (Cal. Rules of Court, rule 8.252(a).)  Placing such a request in an appellate brief is insufficient (*Canal Ins. Co. v. Tackett* (2004) 117 Cal.App.4th 239, 243), and we decline to consider the request or the document itself, which mother improperly included as an exhibit to her briefs.

ICWA inquiry was inadequate. We shall therefore conditionally reverse the orders terminating parental rights and remand for further ICWA proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2023, the Agency filed a dependency petition on behalf of one-year-old A.R. after mother took A.R. to the hospital because the child had ingested an unknown substance from a bottle labeled "poison." A.R. tested positive for methamphetamine, marijuana, and mercury; mother tested positive for methamphetamine, amphetamine, and marijuana a few days later.

Mother had four other children who were not in her care due to substance abuse and domestic violence; three had been adopted and one had been placed with his biological father. Mother also had another child who died after being crushed during a serious domestic violence incident between mother and her then-husband. A.R.'s father, N.R. (father), had not seen A.R. since she was an infant and his whereabouts were unknown.[3] Father had an open child welfare case in Texas (where he was on probation) involving three other children who had been removed from his care due to substance abuse issues.

The dependency petition alleged failure to protect (§ 300, subd. (b)(1)), causing another child's death through abuse or neglect (*id.*, subd. (f)), failure to provide support (*id.*, subd. (g)), and abuse of a sibling (*id.*, subd. (j)). The petition further alleged there was a substantial risk of serious harm to A.R. given mother's substance abuse issues, history of domestic violence, and untreated mental health issues as well as from father's substance abuse. According to the petition, there was reason to believe A.R. is or may be an Indian child within the meaning of the ICWA based on mother's report that she had Choctaw heritage.

---

[3] Father did not participate in the dependency case and is not a party to this appeal.

The Agency recommended the minor be detained. Regarding the ICWA, the detention report initially stated that it did not apply. However, the report then explained that mother claimed both she and father had Choctaw heritage, although neither were enrolled members. A paternal uncle, with whom A.R.'s three paternal half siblings had been placed, also told the Agency that father had Choctaw ancestry but was not enrolled in the tribe. Although the social worker had called the Choctaw tribe to inquire about potential Indian ancestry, she had not yet received a response from the tribe.

In September 2023, mother executed an ICWA-020 parental notification form indicating that she is or may be a member or eligible for membership in a Choctaw and Cherokee tribe.[4] Neither she nor father were present at the detention hearing on September 7, 2023. The juvenile court found there was a reason to believe the ICWA applied and directed the Agency to inquire further. The court also adopted the Agency's recommended findings and orders, detaining A.R. in foster care and ordering interim case plan services for the parents.

The jurisdiction report recommended A.R. remain in out-of-home placement pending disposition and noted that the ICWA-related information was pending verification. An addendum recommended bypassing the parents for reunification services, and stated ICWA verification with the Choctaw Nation was pending.

The Agency's disposition report recommended the juvenile court declare A.R. a dependent, remove her from parental custody, bypass parents for reunification services, and set a section 366.26 hearing. ICWA verification remained pending, although the Agency noted the ICWA may apply. The report included the same general information previously disclosed by mother and paternal uncle regarding possible Indian ancestry and detailed the Agency's efforts to contact the Choctaw Nation tribe.

---

[4] The record also contains unsigned and undated ICWA-020 forms for both mother and father that do not indicate any potential Native American heritage.

At the combined jurisdiction and disposition hearing in October 2023, mother, grandmother, and a maternal aunt were present; father's whereabouts remained unknown. In response to the juvenile court's ICWA inquiry, the aunt and grandmother both confirmed that A.R. had Choctaw heritage on her maternal side, and mother and grandmother indicated that the family had Cherokee ancestry as well. The court found there was a reason to believe the ICWA applied and ordered the Agency to conduct a further inquiry into the parents' ancestry. The court continued the hearing for jurisdiction, disposition, and further ICWA findings. Following the hearing, grandmother filed a relative information form providing her address and cell phone number, the aunt's name and telephone number, and the name of a maternal cousin.

Both mother and grandmother were present at the continued hearing in November 2023. The juvenile court asked mother whether she had provided the Agency with the Notice of Child Custody Proceeding for Indian Child ICWA-030 form, which the court explained was the family questionnaire form, and mother responded that she "believe[d] so." The court asked grandmother whether she had helped mother fill out the ICWA "030" form, and she responded, "yes." Both mother and grandmother reaffirmed that A.R. had Choctaw and Cherokee ancestry on her maternal side. The Agency reported that it had inquired with the Choctaw tribe, but that it had been informed that A.R. was not eligible for enrollment. Nevertheless, the juvenile court kept the status of the ICWA verification process as "pending" and continued the jurisdiction and disposition hearing to allow mother's newly appointed counsel time to prepare for a contested hearing.

In a December 2023 addendum report, the Agency's recommendations remained the same. While the report stated that the ICWA "does or may apply," it noted A.R. was not eligible for membership in the Choctaw Nation.

At the continued hearing in December 2023, both mother and grandmother told the juvenile court that they had filled out the ICWA-030 form and returned it to the Agency. The record, however, does not contain an ICWA-030 form. The court noted that

5

the proceeding was being recorded electronically given the unavailability of a court reporter, and it continued the matter to January 2024 so that a court reporter could be present.

At the hearing in January 2024, mother confirmed she had provided the Agency with the ICWA "family questionnaire." The juvenile court told mother that if there was any information that was incorrect on the ICWA paperwork she had submitted to let the Agency know immediately so that the paperwork could be amended to provide the tribes with the appropriate information. The court then found that there was reason to believe the ICWA applied, and ordered the Agency to continue its ICWA inquiry efforts. Mother's counsel objected to bypassing her for services.

After considering the dependency reports and the arguments of counsel, the juvenile court sustained the petition allegations, declared A.R. a dependent child, adopted the Agency's recommended findings and orders, bypassed reunification services for the parents, and noted that an ICWA determination was pending verification. The court set the matter for a section 366.26 hearing in April 2024.

The Agency prepared an ICWA addendum report in April 2024 that stated A.R. did not qualify as an Indian child within the meaning of the ICWA, and asked the juvenile court to find that the ICWA did not apply. The report included the previously known ICWA information, and described the inquiries it had sent to the Bureau of Indian Affairs (BIA) as well as to three Cherokee tribes--the Cherokee Nation, the United Keetoowah Band of Cherokee Indians, and the Eastern Band of Cherokee Indians, and three Choctaw tribes--the Mississippi Band of Choctaw Indians, the Jena Band of Choctaw Indians, and the Choctaw Nation of Oklahoma.[5] The Agency had received no response from the Jena

---

[5] The Agency contacted the respective tribes in October 2023, and sent a letter to the BIA in April 2024.

Band of Choctaw Indians or the BIA, but all other tribes had responded that A.R. was not a member or eligible for enrollment.

The Agency attached copies of the inquiries it had sent to the BIA and the respective tribes, and the responses it had received. The inquiries had provided mother's name and date of birth; maternal grandfather D.W.'s name (spelled two different ways in the correspondence with the BIA and the tribes and date of birth; maternal grandmother P.P.'s name (misspelled in the letter to the BIA) and date of birth; and father's name and date of birth; no other familial information was included.

At the April 2024 section 366.26 hearing, the juvenile court continued the hearing at the Agency's request to provide publication notice to father but addressed the ICWA's applicability. The court found, based on the April 2024 ICWA addendum report, that the ICWA did not apply. After acknowledging that one tribe had yet to respond to the Agency, the court stated it would revisit its ICWA determination if the Agency reported the tribe had responded that A.R. was eligible for tribal membership.

The juvenile court's written ICWA findings stated in relevant part that (1) the ICWA did not apply to this case; (2) the Agency had made all efforts to obtain familial history, including contacting or attempting to contact the parents and/or all readily available relatives and have submitted the information and notice to the appropriate tribes, BIA and Secretary of the Interior under section 224.2; and (3) that mother had been advised of her appellate rights. Mother timely appealed the court's ICWA findings in case No. C101248.

In July 2024, the Agency filed a section 366.26 report and permanent plan review, recommending termination of parental rights and adoption as the permanent plan. While the report stated ICWA verification was still pending and that it was unknown whether A.R. was eligible for membership in the Choctaw Nation, it noted the April 2024 ICWA addendum report asked the court to find the ICWA did not apply. The Agency had also inquired of multiple extended relatives as to placement of A.R.

7

The report also documented the Agency's family finding efforts.  The Agency had identified and sent relative notification letters as well as ICWA information to 15 living relatives.  According to the report, one letter was returned, nine letters received no response, and one response denied being related.  One relative provided Indian ancestry information, and three others expressed interest in contact or placement.  The Agency attempted to contact the remaining 11 relatives by phone to inquire about Indian ancestry.

The social worker spoke with L.G. in October 2023.  Although he did not know how he was related, he provided Indian ancestry information for his family.  He believed his mother was born in Oklahoma and that his maternal grandmother, was Choctaw and was born in Oklahoma, but died in California.  He also provided the name of his maternal and paternal grandfathers and his paternal grandmother.

In December 2023, the social worker also spoke on the phone with S.W., the wife of the maternal grandfather.  S.W. was also a maternal relative to the sixth degree through maternal grandmother.  S.W. had roll numbers.

A.R. had been with the same nonrelative foster family since she was removed to foster care, and the family wanted to adopt her.  The Agency recommended proceeding with adoption by her current caregivers.  Given mother's sporadic attendance at visits and the instability and neglect A.R. experienced as a result of mother's substance abuse issues, the Agency opined that severing the parental relationship would not be detrimental to A.R.

At a hearing on July 19, 2024, stand-in counsel for mother objected to the Agency's recommendation to terminate parental rights and to select adoption as A.R.'s permanent plan.  Counsel requested a contested section 366.26 hearing, and the juvenile court continued the matter to July 23, 2024.

At the July 23 hearing, the juvenile court informed the parties that a court reporter was unavailable and that the hearing would be recorded electronically.[6] The parties neither objected to nor requested that the court continue the hearing as it had previously done in order to secure a court reporter.

During the hearing, the juvenile court asked mother whether there had been any changes in information regarding Indian ancestry. According to the clerk's minute order, mother stated her grandmother was 100 percent Choctaw, but mother did not know the enrollment number. Mother was provided with a Notice of Child Custody Proceedings for an Indian Children (ICWA-030) form and told to return the form to the Agency within one week so the Agency could provide appropriate notice to the tribe.

Mother's counsel then requested that the juvenile court appoint mother a guardian ad litem because she did not appear to fully understand the proceedings. The court appointed attorney Matthew Hannum, who was present in court, as mother's guardian ad litem and no objection to the appointment appears in the clerk's minutes. The court continued the contested section 366.26 hearing to August 2024 to allow mother to meet with her guardian ad litem.

The juvenile court conducted the contested hearing on August 20, 2024. At the beginning of the hearing, the court again asked mother whether A.R. had Indian ancestry. Mother responded, "yes." When the court asked whether mother had completed and returned the ICWA-030 form that she had been given at the previous hearing, she told the court she had not because she had lost the papers while being evacuated. After noting its records indicated she had already filled out an ICWA-030 form, the court instructed mother to meet with the social worker after the hearing to clarify whether she had

---

[6] The record does not contain a transcript for the July 23 hearing because the electronic recording equipment apparently malfunctioned, and neither party filed a settled statement describing what occurred at the hearing. (See Cal. Rules of Court, rules 8.407(d), 8.346.)

9

completed the form, and, if not, the social worker would provide her with a new form to submit. Mother agreed. The court then stated it would "maintain" its previous April 18, 2024, finding that the ICWA did not apply to A.R.

Mother testified on her own behalf. She said A.R. recognized her and was comfortable during visits where they played together. She sometimes missed visits due to transportation issues. She believed A.R. was bonded to her and that it would be detrimental to A.R. to sever the parent-child relationship. If given the opportunity to reunify, mother believed she could successfully do so as she wanted to obtain treatment that would help her stabilize.

Mother's counsel argued the parental benefit exception to adoption applied, and asked the court to select guardianship, or some other option, that would allow mother the opportunity to reunite with A.R. in the future. Mother's guardian ad litem, who was also present at the hearing, did not argue. Both counsel for the Agency and counsel for A.R. argued mother had failed to establish the parental benefit exception to adoption, noting the Agency's reports showed she had missed a significant number of visits, was inattentive to A.R.'s needs during visits, and had taken minimal steps to bond with A.R. or to rectify the issues that prompted dependency intervention.

Following the close of evidence and argument, the juvenile court found A.R. was adoptable and that the parental benefit exception had not been established; the court terminated parental rights and selected adoption as the permanent plan. During an exchange with the social worker, the court once again attempted to clarify whether an ICWA-030 family questionnaire form had in fact been submitted. The social worker was unsure if it had. Nevertheless, the court again reaffirmed its prior April 2024 finding that the ICWA did not apply, but asked mother to confirm whether she had submitted the requested paperwork. Mother timely appealed the order terminating parental rights in case No. 102236.

10

# DISCUSSION

## I

### *Guardian Ad Litem*

Mother challenges the juvenile court's order appointing her a guardian ad litem, contending the court prejudicially erred and violated her due process rights by making the appointment without first conducting a hearing pursuant to *In re Sara D.* (2001) 87 Cal.App.4th 661 (*Sara D.*) to determine her alleged incompetence and to allow her to respond to the allegation that a guardian ad litem was necessary.

A.  *Requirements and Review for Harmless Error*

In a dependency matter, "a parent who is mentally incompetent must appear through a guardian ad litem, to whom the parent yields management and control of the litigation." (*In re James F.* (2008) 42 Cal.4th 901, 904 (*James F.*); *Sara D., supra*, 87 Cal.App.4th at pp. 665-667.)  The test for mental incompetence is whether the parent has the capacity to understand the nature or consequences of the proceeding and assist counsel in preparing the case.  (*James F.,* at p. 910.)  If direction and control of the litigation is transferred from the parent to a guardian ad litem, the guardian may waive the parent's right to a contested hearing.  (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1186-1187.)

Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing to explain to the parent the purpose and powers of a guardian ad litem and the reasons for believing the parent is incompetent. (*James F., supra,* 42 Cal.4th 901 at pp. 904, 910-911; *Sara D., supra*, 87 Cal.App.4th at pp. 663, 671-672.)  If the parent does not consent to the appointment, the court must give the parent an opportunity to argue that a guardian ad litem is unnecessary.  (*James F.,* at pp. 904, 910-911; *Sara D.,* at pp. 663, 671-672.)

A juvenile court's error in the procedure used to appoint a parent a guardian ad litem in a dependency proceeding is subject to harmless error review. (*James F., supra*, 42 Cal.4th at pp. 904-905, 915.) Although *James F.* did not specify the precise harmless error standard that applies (*James F., supra*, 42 Cal.4th at p. 911, fn. 1), given parents' important fundamental rights to the companionship, custody and care of their children, which are at stake in a dependency proceeding, we apply the more exacting standard here. (See e.g., *Sara D., supra*, 87 Cal.App.4th at pp. 673 [applying federal constitutional standard of harmless beyond a reasonable doubt].)

Various factors may render harmless any error in the procedures used to appoint a guardian ad litem in the dependency context even without a supportable incompetence finding. (See e.g., *James F., supra*, at p. 917; but c.f. *In re Samuel A.* (2021) 69 Cal.App.5th 67, at p. 82, fn. 10 [suggesting that an order appointing a guardian ad litem for a parent without a supportable finding of incompetence is prejudicial under any standard].) This is because we do not determine whether the error was harmless by considering whether the juvenile court would have found appointment of a guardian ad litem necessary had it followed the proper procedure. Instead, we determine whether the error was harmless by considering whether the appointment of a guardian ad litem for mother in this case *affected the outcome of the termination hearing*. (*In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 93.)

Citing *In re Samuel A., supra*, 69 Cal.App.5th at page 85, mother argues any alleged error here was prejudicial per se. But *Samuel A.* itself recognized that appointment of a guardian ad litem in a dependency proceeding is subject to harmless error analysis as stated in *In re James F.* (*Samuel A.*, at p. 82, fn. 10.) In any event, as described above, we follow our Supreme Court and conclude prejudice must be shown.

We presume the juvenile court's orders appointing the guardian ad litem and terminating parental rights are correct, and all intendments and presumptions are indulged to support them on matters as to which the record is silent. (*Denham v. Superior Court of*

*Los Angeles* (1970) 2 Cal.3d 557, 564.) (Here, as previously explained, we have a limited record to review on this issue due to the absence of a reporter's transcript of the July 23 hearing.) We also presume the juvenile court knew and correctly applied the law unless the record indicates otherwise. (See *People v. Jacobo* (1991) 230 Cal.App.3d 1416, 1430.)

      B. *Analysis*

      Mother first argues the juvenile court erroneously appointed the guardian ad litem sua sponte simply because she was difficult and continued to raise ICWA issues. The limited record belies mother's argument.

      The clerk's minute order states that her appointed counsel requested the appointment because he was concerned mother did not fully understand the proceedings. This was a proper consideration in determining whether to appoint a guardian ad litem. (See *James F., supra*, 42 Cal.4th at p. 910.) Also, there is no indication in the clerk's minutes that mother objected when her appointed counsel asked the juvenile court to appoint a guardian ad litem, impliedly consenting to the appointment. (*James F., supra*, 42 Cal.4th at p. 910 ["[i]f the parent consents to the appointment, the parent's due process rights are satisfied"].)

      Finally, we note that nothing in the minute order affirmatively shows the court failed to explain the guardian ad litem process to mother or the necessity for one before making the appointment. On this silent record, mother has failed to meet her appellate burden.

      To the extent mother complains a hearing transcript is not available for the proceeding where the juvenile court appointed the guardian ad litem because an in-person court reporter was not present, she did not object when the juvenile court informed the parties that no court reporter was available and that electronic equipment would be used to record the hearing. Nor did she ask the juvenile court to continue the hearing so an

13

actual court reporter could be present, as the court had demonstrated a willingness to do at a prior hearing.

While it is true the electronic recording equipment apparently malfunctioned, mother could have, but did not, seek to file a settled statement documenting precisely what occurred at the hearing. (See Cal. Rules of Court, rules 8.407(d), 8.346.) Without having done so, she cannot show the juvenile court procedurally erred in appointing the guardian ad litem.

Even if we assume for sake of argument that the juvenile court erred in appointing mother a guardian ad litem, we conclude any such error was harmless beyond a reasonable doubt. Here, the court did not immediately proceed with the contested section 366.26 hearing but instead continued the matter to allow mother time to meet with her guardian ad litem. At the continued section 366.26 hearing, mother did not object to the guardian ad litem or ask that he be removed or indicate in any way that she was dissatisfied with him. During the hearing, she directly engaged with the court regarding ICWA issues and testified on her own behalf as to her visits with A.R., that they shared a bond that would be detrimental to sever if adoption was selected as the permanent plan, and that she intended to take steps to stabilize and improve her circumstances for A.R., including seeking inpatient treatment. Her appointed counsel argued that the juvenile court should find the parental benefit exception to adoption applied and asked the court to select an option, such as guardianship, that would permit the possibility of reuniting with A.R. in the future. The guardian ad litem, while present at the hearing, did not substantively address the court nor did he prevent mother from testifying or from discussing matters directly with the juvenile court, including issues related to the ICWA.

This case, then, is unlike *Sara D.*, where the parent's appointed counsel and guardian ad litem made strategic decisions about conceding jurisdictional issues and affected the manner in which the jurisdictional hearing was conducted, including decisions that prevented the parent from testifying. (*Sara D., supra*, 87 Cal.App.4th at

14

p. 673.)  Under those circumstances, the appellate court could not find beyond a reasonable doubt that the error in appointing the guardian was harmless.  (*Ibid.*)  Nothing similar occurred here.

Instead, this case is more akin to *James F., supra*, 42 Cal.4th at p. 917.  There, our Supreme Court found that a procedural error in appointing a guardian ad litem for an incompetent parent in a dependency proceeding was harmless beyond a reasonable doubt, in part, because nothing in the record suggested the parent was unable to express his wishes to the court, either directly or through his appointed guardian, that he lacked actual notice of the proceedings as they unfolded, that the guardian or his appointed counsel failed to properly advocate for his parental interests, or that the parent ever expressed dissatisfaction with the guardian ad litem or asked the juvenile court to vacate the appointment.  (*James F.*, at p. 917.)  Those same considerations are present here.

The record shows mother was able to communicate directly with the court; raised ICWA issues and testified at the section 366.26 hearing; never objected to the appointment when initially made; did not ask the court to vacate the appointment at the continued contested hearing where she was able to testify.  The appointment of a guardian ad litem, contrary to mother's suggestion, did not silence her or otherwise violate her freedom of speech or right to communicate with her counsel or the court.  Accordingly, we conclude any alleged error in procedurally appointing the guardian was harmless beyond a reasonable doubt.  We are also convinced beyond a reasonable doubt that the outcome, i.e., the termination of mother's parental rights, would have been the same had a guardian not been appointed because it was well established that mother failed to consistently visit with A.R. or foster a sufficient parental bond with her, making her ineligible for application of the exception to adoption.

*ICWA*

Mother contends the Agency and juvenile court failed to comply with the inquiry and notice requirements of the ICWA. She asserts the Agency's efforts to gather relevant familial information about possible Indian ancestry was inadequate in several respects and that the juvenile court's ICWA findings, based on this defective inquiry, are not supported by substantial evidence thus requiring us to reverse and remand for further ICWA compliance.

A. *Applicable Law*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings.' "[7] (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) Under corresponding California law, the juvenile court and the child welfare agency have "an affirmative and continuing duty to inquire" whether a child in a dependency proceeding may be an Indian child. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*); § 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)

Section 224.2 creates three distinct inquiry duties: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice. (§ 224.2, subds. (a)-(c), (e).) When the initial inquiry gives the juvenile court or social worker "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), the court and social worker must conduct further inquiry to "determine whether there is reason to know a child is an Indian child." (§§ 224.2, subd. (e)(2), 224.3 [ICWA notice is required if there is a

---

[7] An "Indian child" is one who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).)

"reason to know" a child is an Indian child as defined under § 224.2, subd. (d)].) The child welfare agency "does not discharge [its] duty of further inquiry until [it] make[s] a 'meaningful effort' to locate and interview extended family members and to contact [the BIA] and the tribes." (*In re K.T.* (2022) 76 Cal.App.5th 732, 744.) If that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

On appeal, we review ICWA findings and orders for substantial evidence. (See *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051; § 224.2, subd. (i)(2).) The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

B. *Analysis*

Mother first argues the juvenile court erred by improperly shifting the Agency's burden to gather relevant ICWA information to her and grandmother. We are not persuaded.

While it is true that the juvenile court repeatedly asked mother and grandmother about potential Native American heritage at multiple hearings, doing so did not shift the Agency's burden of inquiry to them. Instead, as the Agency notes, under section 224.2 and the related rules of court, the court was required to ask each participant in any hearing that may culminate in an order for foster care placement or termination of parental rights, if the participant knows or has reason to know the child is an Indian child. (§ 224.2, subd. (c); rule 5.481(a)(2)(A).)[8] The court did so first by confirming mother's

---

[8] Rule 5.481(a)(2)(A) provides in relevant part: "At the first appearance by a parent . . . and all other participants in any dependency case . . . proceeding to terminate parental

17

response in the ICWA-020 form that she had Choctaw and Cherokee heritage. The court then confirmed the information mother had provided with (maternal) grandmother and even a maternal aunt who attended one or more of the hearings. This was proper.

It is also true that the juvenile court asked mother and grandmother whether they had filled out an ICWA-030 family questionnaire form and had provided it to the Agency. While it is generally the social worker or Agency's duty to send the ICWA-030 form to the parent, legal guardian and Indian custodian once it is known or there is reason to know an Indian child is the subject of a dependency proceeding (rule 5.481(c)(1)), the court's question did not improperly place the burden of inquiry on mother and grandmother. Rather, we interpret the court's questions regarding the ICWA-030 form as a broad attempt to fulfill its responsibility to continuously inquire about A.R.'s possible Indian heritage, including asking the parents and participants if they had pertinent information. (§ 224.2, subd. (a) [describing a court's affirmative and continuing duty to inquire whether a child involved in a dependency proceeding is or may be an Indian child]; cf. *Dezi C.*, *supra*, 16 Cal.5th at p. 1126 [juvenile court asked the parents about the accuracy of their ICWA-020 forms and whether they had Indian heritage during initial detention hearing and ordered the parents to provide the social services department with the name, address, and any other identifying information of maternal and paternal relatives].) Under section 224.2, subdivision (c), for example, a juvenile court must instruct the parties and persons present at a dependency hearing to inform the court if they subsequently received information that provides reason to know the child is, or may be, an Indian child.

---

rights, proceeding to declare a child free of the custody and control of one or both parents . . . and at each hearing that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement or adoptive placement, as described in [] section 224.1(d)(1) . . . . [¶] (A) Ask each participant present whether the participant knows or has reason to know the child is an Indian Child."

Here, the juvenile court's questions regarding familial information generally included on an ICWA-030 form are best understood in the context of asking mother and grandmother whether they had provided all relevant information of which they were aware that might have aided the Agency in fleshing out whether A.R. is or may be an Indian child. The court made clear, however, that it was the *Agency's* responsibility to continue to make inquiries under the ICWA to confirm A.R.'s potential Indian heritage. The burden to conduct the requisite ICWA inquiry appropriately remained on the Agency throughout the dependency proceedings despite the court asking mother and grandmother about the ICWA-030 form.

Mother next argues that the Agency's inquiry efforts were deficient because it failed to ask known extended relatives for relevant paternal and maternal familial information, and to provide known familial information, including an identified maternal relative with a roll number, to the relevant tribes. We agree.

Although the Agency was in contact with paternal uncle, who had custody of A.R.'s three paternal half siblings and stated that father had Choctaw heritage, nothing in the multiple reports submitted to the juvenile court indicate that the Agency asked him for relevant familial information on A.R.'s *paternal* side. The paternal uncle, as father's brother, would be reasonably likely to have information about their parents and grandparents. Yet, it does not appear that such questions were ever asked, or if they were, that the paternal uncle's responses were documented for the juvenile court's consideration.

The Agency also was in contact with a paternal aunt in Arizona who had expressed interest in providing a placement for A.R. As father's sister, she too would have likely had relevant information regarding A.R.'s paternal grandparents or great-grandparents. Yet, nothing in the record shows the Agency asked this aunt for familial information that might shed light on A.R.'s possible Choctaw lineage through her father's side. And no paternal information beyond father's name and date of birth was included in the Agency's

19

correspondence to the BIA and the respective tribes even though the Agency was in contact with several paternal relatives.

Similarly, as mother argues, it does not appear that the Agency ever asked the maternal grandmother, who attended most of the dependency hearings and participated in visits with A.R., to identify her *own* parental lineage. We reject the Agency's argument that it is speculative to assume grandmother would know the identities or have other information about her own parents. And, to the extent the Agency implies that the grandmother would have responded that she did not have such information, it did not, as required, document its efforts to obtain such information and her response for the juvenile court's consideration.[9]

Given that mother, maternal grandmother, a maternal aunt, and a paternal uncle, *all* stated that A.R. had Choctaw heritage on both sides of the family, the Agency had a duty to contact these known extended family members to further inquire about A.R.'s possible heritage, and to include all relevant information in the inquiries sent to the tribes asking whether A.R. was a member or qualified for enrollment in the respective tribes. Likewise, the Agency had information that S.W. (maternal grandfather's wife), who was also a relative of maternal grandmother, was an enrolled member of a tribe. Such information should have been provided to the relevant tribes.

Furthermore, although mother initially responded that she "believed" she had filled out an ICWA-030 form and had given it to the Agency in response to the juvenile court's questions, no such form is appended to any of the Agency's reports that are included in either record on appeal. Based on the record, it is conceivable that mother may have confused the ICWA-020 parental notification form, filed at the beginning of the

---

[9] Mother emphasizes that maternal grandmother's name was misspelled in the tribal notices, but, as the Agency points out, the misspelling occurred only in the correspondence with the BIA and not with the actual tribes.

20

case, with the more extensive ICWA-030 form, which includes spaces to list detailed personal information on numerous extended family members and their potential tribal affiliations.  Indeed, by the section 366.26 hearing, there still appeared to be some confusion over whether an ICWA-030 form had in fact been submitted.  Mother informed the court at the hearing that she had not filled it out because she had lost the paperwork.  The social worker was also unclear whether an ICWA-030 form had been prepared.  And nothing shows any such form or information was ever provided to any of the six Indian tribes the social worker contacted during the proceedings.

Because the Agency's inquiry efforts as to extended relatives were insufficient, the juvenile court's findings that the Agency had made all efforts to obtain familial history, including contacting or attempting to contact the parents and/or all readily available relatives, that it submitted such familial information to the appropriate tribes and the BIA under section 224.2, and that the ICWA did not apply must be vacated, and we must conditionally reverse the orders terminating mother's parental rights and remand the matter for further ICWA inquiry and findings.  (See *Dezi C., supra*, 16 Cal.5th at p. 1112.)

## DISPOSITION

The juvenile court's orders terminating parental rights are conditionally reversed.  On limited remand, the juvenile court shall order the Agency to comply with the inquiry and notice provisions of the ICWA, as well as the requirements of sections 224.2 and 224.3 and the documentation provisions of rule 5.481(a)(5) of the California Rules of Court.  If the juvenile court thereafter finds a further inquiry was proper and adequate, due diligence has been conducted, and the ICWA does not apply, the orders terminating parental rights shall be reinstated.  If, however, the juvenile court concludes the ICWA

21

applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with the ICWA and California implementing provisions.

/s/
Duarte, J.

We concur:

/s/
Hull, Acting P.J.

/s/
Wiseman, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.